UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JASON BOYCE,

               Plaintiff,

      v.

BRUCE WEBER and LITTLE BEAR, INC

           Defendants

Case No.  1:19-cv-03825-JMF

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT………………………………………………1

II.     RELEVANT PROCEDURAL AND FACTUAL HISTORY…………………,……..2

        A.      Plaintiff's Complaint and Amended Complaint………..…………………..2

                1.      Plaintiff's Original Complaint…………………………….…..…..2

                2.      Plaintiff's Amended Complaint………………………………..3

        B.      Evidence and Testimony Demonstrate that Weber Did
                Nothing to Entice or Recruit Plaintiff………………………………….....3

                1.      Weber is a Fashion Photographer…………………………………3

                2.      Plaintiff is a Failed Model…………………………..………...4

                3.      Plaintiff's Obsession with Weber Dates as Far
                        Back as 2010………………………………….………………4

                4.      Between 2010 and the December 2014 Portrait Session,
                        Plaintiff and his Agents Relentlessly Pursued Weber and Made
                        Multiple Unsuccessful Attempts to Entice Weber to
                        Photograph Plaintiff……………………………….…………4

                5.      Plaintiff's Pursuit of Weber Intensified and Continued…………....5

                6.      Weber Agrees to do a Portrait Session with Plaintiff as a
                        Favor to Kanner, Plaintiff's New York Agent………………….....7

                7.      Setting Up the Portrait Session………………………………7

                8.      The Portrait Session………………………………………9

                9.      The Portrait Session did not Involve any Employment
                        Opportunity………………………………………………...9

                10.     Plaintiff Praised Weber after the Favor Portrait Session
                        And Continued to Press Hi Agents to Contact Weber for Him………9

11.      Plaintiff's Pursuit of Weber Continued Long After the Favor
         Portrait Session – Though 2015 and 2016………………………...10

C.      Evidence Regarding Employment Allegations………………………10

II.      ARGUMENT……………………………………………………………11

A.      The Applicable Standard………………………………………………11

B.      Summary Judgment Should Be Granted On Plaintiff's
         Employment Claims……………………………………………………12

         1.      Counts I-IV Fail as a Matter of Law Because
                 Plaintiff Cannot Establish a *Prima Facie* Case
                 Of Discrimination or Harassment……………………………12

         2.      Counts I-IV Fail as a Matter of Law Because
                 Defendants Were Not Employment Agencies or
                 Employers *as to Plaintiff*……………………………………14

         3.      Plaintiff's Aiding And Abetting Claims as a
                 Matter of Law………………………………………………15

C.      The Court Should Grant Summary Judgment On the Sex
         Trafficking Claim Because Weber Did Not Recruit or Entice
         Plaintiff to the Photoshoot……………………………………………16

IV.      CONCLUSION……………………………………………………………..21

TABLE OF AUTHORITIES

Page(s)

Cases

*Aguirre v. Best Care Agency, Inc.*
    961 F. Supp. 2d 427 (E.D.N.Y. 2013) ...................................................................20

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)..............................................................................................11, 12

*Ardolf v. Weber*
    332 F.R.D. 467 (S.D.N.Y. 2019) ..........................................................................19

*Barounis v. N.Y.C. Police Dep't*
    No. 10 Civ. 2631 (SAS), 2012 WL 6194190 (S.D.N.Y. Dec. 12, 2012)................13

*Bright v. Coca Cola Refreshments USA, Inc.*
    No. 12 CIV. 234 BMC, 2014 WL 5587349 (E.D.N.Y. Nov. 3, 2014) ...................14

*Bright v. Coca-Cola Refreshments USA, Inc.*, 639 F. App'x 6 (2d Cir. 2015)..............14

*Canosa v. Ziff*
    No. 18 Civ. 4115 (PAE), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019)............15, 19

*David v. The Weinstein Co.*
    2019 WL 6954363 (S.D.N.Y. Dec. 19, 2019) ........................................................19

*Ditullio v. Boehm*
    662 F. 3d 1091 (9th Cir. 2011) ..............................................................................16

*Erlach v. New York City Bd. of Educ.*
    No. CV 94 4239 (RJD), 1996 WL 705282 (E.D.N.Y. Nov. 26, 1996) ..................14

*Erlach v. New York City Bd. of Educ.,* 129 F.3d 113 (2d Cir. 1997).............................14

*Farzan v. Wells Fargo Bank, N.A.*
    No. 12 CIV. 1217 RJS JLC, 2013 WL 6231615 (S.D.N.Y. Dec. 2, 2013) ............14

*Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015) .................................................14

*Geiss v. The Weinstein Co.*
    383 F. Supp. 3d 156 (S.D.N.Y. 2019)....................................................................19

*Hicks v. IBM*
    44 F. Supp. 2d 593 (S.D.N.Y. 1999).......................................................................15

*Hill v. Rayboy-Brauestein*
    467 F.Supp.2d 336 (S.D.N.Y. 2006).......................................................................13

*Holcomb v. Iona Coll.*
    521 F.3d 130 (2d Cir. 2008) ........................................................................13

*Hongyan Lu v. Chase Inv. Servs. Corp.*
    412 F. App'x 413 (2d Cir. 2011) .................................................................13

*Huett v. The Weinstein Co.*
    2018 WL 6314159 (S.D.N.Y. Nov. 5, 2018) ................................................19

*Langhorne v. Port Authority of New York*
    No. 03 CIV 4610, 2005 WL 3018265 (S.D.N.Y. Nov. 10, 2005) .................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) .....................................................................................12

*McDonnell Douglas Corp. v. Green*
    411 U.S. 792 (1973) .....................................................................................13

*Noble v. Weinstein*
    335 F. Supp. 3d 504 (S.D.N.Y. 2018) ...........................................16, 18, 19, 20

*Pace v. Ogden Servs. Corp.*
    257 A.D.2d 101, 692 N.Y.S.2d 220 (3rd Dep't 1999) ..................................13

*Salahuddin v. Goord*
    467 F.3d 263 (2d Cir. 2006) ..................................................................11, 18

*Scaglione v. Chappaqua Cent. Sch. Dist.*
    209 F.Supp.2d 311 (S.D.N.Y.2002) .............................................................12

*Scott v. Harris*
    550 U.S. 372 (2007) .....................................................................................11

*Shuvalova v. Cunningham*
    No. 10-CV-02159, 2010 WL 5387770 (N.D. Cal. Dec. 22, 2010) ...............16

*Strauss v. New York State Dep't Of Educ.*
    26 A.D.3d 67, 805 N.Y.S.2d 704 (3d Dep't 2005) .......................................15

*United States v. Evans*
    476 F.3d 1176 (11th Cir. 2007), *cert. denied,* 552 U.S. 878 ......................20

*United States v. Todd*
    627 F.3d 329 (9th Cir. 2010) .......................................................................20

*Vivenzio v. City of Syracuse*
    611 F.3d 98 (2d Cir.2010) ............................................................................13

<u>Statutes</u>

18 U.S.C 1951................................................................................................. *passim*

18 U.S.C. § 1595................................................................................................16

42 U.S.C. § 2000e-2(b)......................................................................................12

<u>Other Authorities</u>

N.Y.C. Admin. Code § 8-107 .............................................................................15

N.Y. Exec. Law § 296.................................................................................12,13,14,15

Defendants Bruce Weber ("Weber") and Little Bear, Inc. ("Little Bear") (collectively, "Defendants"), through undersigned counsel, file this memorandum of law in support of their Motion for Summary Judgment dismissing the complaint of plaintiff Jason Boyce ("Plaintiff").

## I.
## PRELIMINARY STATEMENT

Based on Plaintiff's allegation that Weber, a photographer, improperly touched him during a photoshoot, Plaintiff filed a complaint in state court asserting six employment-based discrimination causes of action against Defendants. Over one year later, based on the *identical* allegations, Plaintiff amended his complaint to add a claim against Weber under the Justice for Victims of Trafficking Act of 2015, 18 U.S.C. § 1591 ("Sex Trafficking Act").

As explained below, Plaintiff's employment-based claims fail because there is no genuine dispute that Plaintiff's photoshoot with Weber was just that—a photoshoot with a photographer—and did not involve any job opportunity. The undisputed evidence is that Weber agreed to the photoshoot as a favor to Plaintiff's agent and not for any employment. Indeed, Plaintiff understood that the photoshoot "was not for a specific job." Boyce Tr.. 148:1-8. Thus, the Court should grant summary judgment dismissing Plaintiff's employment-based claims.

As to Plaintiff's Sex Trafficking Act claim, that cause of action requires Plaintiff to prove, among other things, that Weber "recruited" or "enticed" Plaintiff to attend the portrait session at which the alleged "commercial sex act" occurred. However, the record shows that Weber in no way enticed Plaintiff to meet him that day. To the contrary, the overwhelming evidence, including Plaintiff's admissions, shows that: (1) Plaintiff engaged in an unprecedented, relentless, multi-year campaign to entice Weber to photograph him (that continued for over a year and a half after the portrait session), and (2) Weber never initiated any conversation about shooting Plaintiff and only finally agreed to the portrait session as a favor to Plaintiff's agent.

Thus, because Plaintiff cannot establish the required "recruitment" or "enticement" element of a claim under the Sex Trafficking Act, the Court should grant summary judgment dismissing the claim.

## II.
## RELEVANT PROCEDURAL AND FACTUAL HISTORY[1]

**A.**     **Plaintiff's Complaint and Amended Complaint**

    **1.**     **Plaintiff's Original Complaint**

On December 1, 2017, Plaintiff filed his complaint in state court ("Original Complaint") (Dkt. No. 1-1) against his modeling agency, Soul Artist Management; his New York agent, Jason Kanner ("Kanner");[2] Weber, a fashion photographer; and Little Bear, a production company.[3] Plaintiff alleges that, during a photoshoot, Weber inappropriately and briefly touched Plaintiff's genitals. Based on these allegations, Plaintiff asserted five employment-based causes of action against Defendants under the New York State Human Rights Law ("NYSHRL") and York City Human Rights Law ("NYCHRL"): (1) sexual harassment and discrimination as employment agencies (Counts I and II), (2) sexual harassment and discrimination as potential employers (Counts III and IV), and (3) aiding and abetting these violations (Count V).

---

[1] The accompanying Rule 56.1 Statement of Facts contains a more detailed listing of the facts supporting this Motion. Defendants cite to the following deposition transcripts herein: the deposition of Plaintiff Jason Boyce, dated July 9, 2019 ("Boyce Tr."); the deposition of Bruce Weber, dated September 19, 2019 ("Weber Tr."); and the deposition of David Todd, Plaintiff's agent, dated March 5, 2019 ("Todd Tr."). Excerpts from these depositions are attached as Exhibits A-C, respectively, to the Declaration of Daniel Brown, dated February 17, 2020 ("Brown Decl.").

[2] On May 7, Plaintiff filed a stipulation of dismissal with prejudice of Jason Kanner and Soul Artists. (Dkt. No. 12).

[3] *See* Little Bear's Response to Plaintiff's Interrogatory No. 11 (Brown Decl., Ex. D).

### 2.     Plaintiff's Amended Complaint

Over one year later, on or around April 9, 2019, Plaintiff filed an amended complaint ("FAC") which added a cause of action against Weber under the Sex Trafficking Act. This case was then removed to this Court. (Dkt. No. 1). As shown by the redline comparing the FAC to the Original Complaint, Plaintiff's Sex Trafficking Act claim is based on identical factual allegations as his employment-based causes of action.[4]

### B.     **Evidence and Testimony Demonstrate that Weber Did Nothing to Entice or Recruit Plaintiff**

### 1.     **Weber is a Fashion Photographer**

- Weber is a fashion photographer who has worked in the industry for over 50 years. Weber Tr. 50:22-51:2.

- Weber has photographed thousands of models over his career. Weber Tr. 318:20-319:13.

- Kanner was Plaintiff's New York-based agent. Todd Tr. 197:24-198:21.

- David Todd ("Todd") was Plaintiff's California-based agent. Todd Tr. 197:24-198:21.

- Weber had no authority or power to select or hire models for campaigns,[5] and the decisions about which models to hire were made by the brands or magazines themselves. *See* Weber Tr. 182:1-184:19; 194:7-195:3; Todd Tr. 73:6-11; 75:3-14.

- It is very common in the industry for an agent to arrange for a photographer to take pictures/portraits of a model for the model to include in his or her portfolio, which is then used to by the agent to try to market the model. For example, shortly before the portrait session with Weber, Plaintiff was photographed by Darren Tieste. Plaintiff admitted that those photographs were not for a job; they were just for his book/portfolio. Boyce Tr. 93:1-9; 98:17-24.

- Similarly, Plaintiff was photographed in 2011 by photographer Douglas English, not for a job, but for his book. Boyce Tr. 71:17-20; 74:20-24. Another example was when photos were arranged to be shot by photographer Scott Hoover and were not a job; they were for Plaintiff's book. Boyce Tr. 264:8-19.

---

[4] *See* Brown Decl., Ex. E.

[5] Campaigns are typically "brand campaigns" or "editorial campaigns." For a brand campaign, the client is a brand, such as Abercrombie & Fitch or Ralph Lauren. For an editorial campaign, the client is a magazine, such as Vogue.

### 2.      Plaintiff is a Failed Model

- In the Complaint, Plaintiff describes himself as an "aspiring model". FAC, ¶ 124. In fact, Plaintiff concedes that from 2009 through 2014, he was not making it as a model and that had absolutely nothing to do with Bruce Weber. Boyce Tr. 55:4-8.

- Plaintiff  admitted he was never able to make a living and support himself as a model. From 2009 through 2014, Plaintiff did not dispute that he never made more than $15,000 in any given year from modeling. In fact, some years, he made no money at all modeling, as was the case for 2014. *See e.g.*, Boyce Tr. 30:18-23; 31:9-21; 53:9-56:8; 96:1-2.

- Todd, Plaintiff's agent, testified that Plaintiff's modeling career was like a flat line on a graph. Todd Tr. 167:17-24.

### 3.      Plaintiff's Obsession with Weber Dates as Far Back as 2010

- Plaintiff began pursuing Weber in 2010, the year he started modeling, and his pursuit was relentless and continued year after year. Boyce Tr. at 120:20-121:8; 135:20-136:2.

- Todd could not think of any other instance (in over 20 years of being an agent) of a model pursuing a photographer so relentlessly as Plaintiff pursued Weber. Todd Tr. 169:8-18. Plaintiff did not dispute Todd's characterization of Plaintiff's pursuit of Weber. Boyce Tr. 135:20-136:2.

- Plaintiff "believed" that if he could just get in front of Weber, "the heavens would open" and after years of rejection, job opportunities would suddenly appear.[6] Boyce Tr. 102:13-103:7.

### 4.      Between 2010 and the December 2014 Portrait Session, Plaintiff and his Agents[7] Relentlessly Pursued Weber and Made Multiple Unsuccessful Attempts to Entice Weber to Photograph Plaintiff

- Starting as early as 2010, Plaintiff met with Todd to discuss his pursuit of Weber and his desire for Weber to shoot him. Boyce Tr. 100:23-102:12.

- On August 26, 2010, Plaintiff emailed Todd, "Yo, do you think I will get a chance to meet Bruce Weber." (Brown Decl., Ex. F).

- On April 18, 2011, Plaintiff emailed Todd, "Hey can I go see with Bruce Weber?  Is he in NY right now?" (Brown Decl., Ex. G). Todd told Plaintiff he would set it up. *Id.*

---

[6] Of course, this is nothing but speculative conjecture and inadmissible testimony.

[7]  Plaintiff admitted that his agents contacted Weber many times, all at Plaintiff's request. Boyce Tr. 93:24-94:18. Plaintiff testified that he asked his agents to contact Weber because he wanted to "get in front of him." Boyce Tr. 94:11-18.

- On April 19, 2011, Plaintiff emailed Todd, "[C]an I call you about Bruce Weber?" (Brown Decl., Ex. H). The same day, Todd emailed Weber a photo of Plaintiff. (Brown Decl., Ex. I).

- On April 20, 2011, Todd emailed Weber several more pictures of Plaintiff, stating, "You will LOVE this kid Bruce." (Brown Decl., Ex J).

- On April 20, 2011, Plaintiff went to Little Bear for a "go-see".[8] (Brown Decl., Ex K). Weber was not present for the "go-see". Boyce Tr. 106:12-14; 107:21-108:12. After seeing Plaintiff, Weber's assistant emailed Weber about Plaintiff. (Brown Decl., Ex. L) ("Bruce, saw this guy today-sweet guy-but has a very 'boxy' face."). *Weber never responded or commented.*

- Neither Weber nor Little Bear expressed any interest in Plaintiff after the "go-see," and Plaintiff was disappointed by that. Boyce Tr. at 108:9-109:13 ("A. That is April 20th, 2011. Q. Okay. And that's pretty typical of a go-see, you take quick pictures. You're in and out; right? A. Correct. Q. Okay. Nothing came from that; right? A. Nothing came from that. Q. Were you disappointed? A. Probably. . . . Q. Okay. But [Little Bear] didn't - - but nobody ever reached out to you, so, obviously, [your agents] weren't right about that, were they? A. Apparently.").

### 5.    Plaintiff's Pursuit of Weber Intensified and Continued

- On March 1, 2013, Todd texted Weber, unprompted, "Its David! Can I send you a super-hot boys pic [Plaintiff] took for me to send you for your eyes only?" Todd then texted, "This is Jason Boyce 24 and 6 feet. Stunning!!!" Todd included a nude "selfie" photograph of Plaintiff. (Brown Decl., Ex. M).[9]

- David Todd testified that Plaintiff had supplied the nude "selfie" to Todd so that Todd could send it to Weber, and that it was Plaintiff's idea to send a nude "selfie". Todd Tr. 87:25-88:17.

- Weber responded to Todd the same way he responds to all agents with whom he regularly worked—politely, with compliments and generic questions. Weber Tr. 135:19-140:8.

- On March 2, 2013, Todd texted Weber and asked if Weber could see Plaintiff the next day. (Brown Decl., Ex. M).

- On March 4, 2013, Todd texted Weber **four more times** to ask whether Weber was in town

---

[8]  A "go-see" is an encounter between a model and photographer or casting person and typically involves taking test photos of the model.

[9] This and other nude photos included with the motion are redacted out of respect for the Court and at the request of Plaintiff's counsel.

and to state that Plaintiff would love to meet him. (Brown Decl., Ex. M). Weber did not reply until 3 days later, on March 7, 2013, when Weber texted Todd, "No I am leaving sorry – but keep in touch and hope to see you soon". *Id*.

- There is no evidence that Weber ever followed up or expressed any interest in photographing Plaintiff after Todd's March 2013 texts. There is no evidence that Weber nor Little Bear attempted to meet or speak with Plaintiff after Todd's March 2013 texts.

- On February 18, 2014, Todd texted Weber, "Jason Boyce 6 feet 24 gorgeous," and again included a nude "selfie" photograph of Plaintiff. (Brown Decl., Ex. N).

- After Todd answered Weber's standard questions about Plaintiff, Weber wrote Todd: "You know I like your guys - - I'm on a crazy scheduled well that's all I can say now." (Brown Decl., Ex. N).

- Todd testified that he sent the text messages and nude photos to Weber at Plaintiff's direction. Todd Tr. 87:25-88:17.

- There is no evidence that Weber ever followed up or expressed any interest in photographing Plaintiff after receiving these texts in 2014.[10]

- Todd testified that he could not think of any other photographer, besides Weber, to whom Plaintiff suggested he send nudes. Todd Tr., 168:15-21.

- On June 2, 2014, Kanner emailed several pictures of Plaintiff to Weber. (Brown Decl., Ex. O). Bruce Weber did not respond to the email or comment on the pictures.

- In or about November 2014, Plaintiff was photographed by Joe Lally for Plaintiff's book, which, as indicated previously, is typical in the industry. Plaintiff asked Lally if he knew Weber and asked if he would send Weber the photos he was taking for Plaintiff's book. Boyce Tr. 128:20-129:20.

- Plaintiff admitted that he and his agents sent Weber pictures because Plaintiff wanted to get Weber interested in him as a model, but by 2014 nothing had come of it. Boyce Tr. 112:23-113:6.

- Plaintiff admitted that he and his agents initiated conversations with Weber about Plaintiff, and that Weber <u>never</u> initiated conversations about Plaintiff. Boyce Tr. 113:7-21.

---

[10] The text conversations in 2014 between Todd and Weber are almost identical to those in 2013. It is evident form the texts that neither recalled the earlier conversation.

### 6.    Weber Agrees to do a Portrait Session with Plaintiff as a Favor to Kanner, Plaintiff's New York Agent

- On November 19, 2014,[11] Kanner again emailed Weber about Plaintiff: "Bruce how are you? . . . I have not been crazy about a guy in a LONG time ... this is the one . . . you have to trust me here . . . I hope you like him." Kanner attached eleven pictures of Plaintiff to the email. (Brown Decl., Ex. P).

- In or about November 2014, Weber worked on a brand campaign for Barney's. Barney's provided a very low budget for model pay. Nevertheless, Kanner, with whom Weber has had a long-standing professional relationship, came through with talented models at the low price, for which Weber was very appreciative and grateful. Weber Tr. 90:24-91:14; 150:1-8.

- Thus, on November 21, 2014, Weber responded to Kanner's November 19 email, stating, "[M]aybe I can meet him in NYC when come back to the city in December . . . **thanks for helping us with this Barney's thing**". (Brown Decl., Ex. Q).

- On November 21, 2014, Kanner wrote back to Weber that Plaintiff was incredible, Plaintiff would have been great for Versace, and that Plaintiff be in New York and available to meet Weber until December 18, 2014. (Brown Decl., Ex. Q).

### 7.    Setting Up the Portrait Session

- Kanner called Weber and asked him to take photographs of Boyce **as a favor**. Weber Tr. 88:8-14; 91:4-14; Boyce Tr. 146:13-21 (admitting that Kanner arranged with Weber for the portrait session).

- Weber agreed to take some photos of Plaintiff for Plaintiff's modeling book and *not* for any employment or referral opportunity, as a favor to Kanner. Weber Tr. 96:16-97:18.

- On November 24, 2014, Kanner gave Plaintiff Weber's phone number and told him to call him. Boyce Tr. 130:14-17 ("Q. November 24th, when Kanner tells you all this, he tells you -- he gives you Bruce Weber's phone number. And he said Bruce Weber said to call him; right? A. Correct.").

- Plaintiff testified that he called Weber that day and they engaged in "unimportant, small talk." Boyce Tr. 143:2-8.

- After that call, Plaintiff texted Weber a "selfie" and said he was working on losing his "love handles" and he would see Weber soon. (Brown Decl., Ex. R). *Weber did not respond.*

---

[11] Time stamps on emails vary given time zones. For example, some record evidence reflects that this email was sent the evening of November 19, while others reflect just after midnight on November 20.

- On November 27, 2014, Kanner emailed Weber about Plaintiff and another model named Braeden. Kanner added that Plaintiff was "incredible" and that Weber "should be shooting" him. (Brown Decl., Ex. S).

- On November 28, 2014, Weber responded by wishing Kanner a happy Thanksgiving and asking about Braeden (but *not* asking about Plaintiff). (Brown Decl., Ex. S).

- Kanner wrote back and brought up Plaintiff again, unprompted, claiming that Plaintiff was "leading the pack" of his models, and he wanted Weber to meet him. (Brown Decl., Ex. S). Again, *Weber did not respond or show any interest in Plaintiff.*

- On December 5, 2014, Kanner emailed Weber to remind him about Plaintiff, imploring him to meet with Plaintiff the following week. Kanner attached 9 pictures of Plaintiff to this email. (Brown Decl., Ex. T).

- On December 11, 2014, Kanner emailed Weber yet again. The subject of the email is "Jason Boyce by Tarrice Love [a photographer]". Kanner attached 6 more pictures of Plaintiff to this email. (Brown Decl., Ex. U).

- On December 12, 2014, Kanner told Plaintiff to meet Weber at a jewelry store. Boyce Tr. 131:18-21; 132:22-23.

- Weber had already agreed to photograph Plaintiff *prior* to seeing Plaintiff at the jewelry store, but Weber wanted to meet Plaintiff briefly before photographing him, as he typically does with portrait subjects. Weber Tr. 92:16-95:12

- When they met at the store, they introduced themselves, and Weber made suggestions about Plaintiff's "look" for the portrait session, such as not to shave and to bring a black shirt if he had one. Weber Tr. 92:19-93:16. As with their prior phone conversation, the meeting consisted of "small talk" and nothing more.[12]

---

[12] Plaintiff's description of the jewelry store meeting aligns with Weber's description, admitting this conversation, like the first phone conversation, was "mostly small talk". Boyce Tr. 143:24-145:7. Plaintiff admitted that Weber had already agreed to take pictures of him before the jewelry store meeting, and thus there was no discussion at the jewelry store about whether the portrait session would take place. Boyce Tr. 138:17-21. However, in questioning from his own attorney, Plaintiff testified for the first time that when he met Weber at the jewelry store, Weber set up the photoshoot with him. Boyce Tr. 361:18-21. However, it is undisputed the conversation setting up the portrait session was between Kanner and Weber. Plaintiff was not part of the conversation, and thus, he has no firsthand knowledge of it. Whatever he "believed" or thought" is irrelevant and inadmissible hearsay. Moreover, Plaintiff admits that Weber told him not to shave for the portrait session, which also confirms it had already been agreed between Kanner and Weber that Weber was going to photograph Plaintiff. Boyce Tr. 144:24-145:7.

- The November 24, 2014 phone conversation and this December 12, 2014 jewelry store meeting were the *only two interactions between Plaintiff and Weber before the photoshoot and alleged incident*. It is undisputed **that there are no other communications from Weber to Plaintiff during which Weber could have recruited or enticed Plaintiff**.

### 8.      The Portrait Session

- On December 15, 2014, Kanner emailed Weber: "I know that Mr. Jason Boyce has been trying to set up a time to see you. I know you're busy and I really appreciate that you'll see him. Let me know if there is anything I can do to help." (Brown Decl., Ex. V).

- The photoshoot and alleged incident occurred shortly thereafter, on December 15 or 16, 2014. Boyce Tr. at 214:2-215:16

- There is no claim or evidence that Plaintiff ever saw Weber in person again after the photoshoot.

### 9.      The Portrait Session did not Involve any Employment Opportunity

- It is undisputed that the portrait session Weber agreed to do with Plaintiff as a favor to Kanner. Weber Tr. 88:8-14; 91:4-14.

- Weber agreed to take some photos of Plaintiff for Plaintiff's modeling book as a favor to Kanner and *not* for any employment or referral opportunity. Weber Tr. 96:16-97:18.

- Indeed, Plaintiff concedes in deposition that the portrait session with Weber "was not for a specific job." Boyce Tr. 148:1-12.

### 10.     Plaintiff Praised Weber after the Favor Portrait Session And Continued to Press His Agents to Contact Weber For Him

- On December 16, 2014, Plaintiff texted his California agent, Todd, "Just met and shot with Bruce Webber! . . . Such a nice guy. So encouraging. Will you ask him what he thought of me??? . . . I know if you ask him, you'll get the real story :-)". (Brown Decl., Ex. W). Plaintiff added, "I'm getting more and more self-confidence. I know it's a problem area for me. Hearing no for so many years. But with you in my corner, and jay [Kanner]. And hopefully Bruce [Weber]. I can't help but be confident." *Id*.

- Plaintiff admitted these texts with Todd occurred and that they happened the day after the photoshoot with Weber. Boyce Tr. at 214:2-215:16.

- On December 16, 2014, Kanner emailed Weber **thanking him** for seeing Plaintiff and requesting his feedback on Plaintiff. (Brown Decl., Ex. X). There is no evidence that Weber ever responded to this email.

11. **Plaintiff's Pursuit of Weber Continued Long After the Favor Portrait Session – Through 2015 and 2016**

- On March 14, 2015, Plaintiff texted Weber, unprompted, stating, "Hi Bruce!! I hope you are doing well. This is Jason Boyce. I just wanted to say hello! :-)". Weber responded by asking whether Plaintiff received his photographs from their photoshoot. Plaintiff stated that he would check with his agency and hoped he would see Weber in April 2015 when he returned to New York. *Weber did not respond.* (Brown Decl., Ex. Y).

- On April 27, 2015, Plaintiff texted Weber, again, unprompted, "Happy Monday Bruce! I hope you are well :-)". Plaintiff attached a picture of himself posing shirtless. Weber responded <u>three days later</u>, "Good to hear from you." (Brown Decl., Ex. Z).

- On May 16, 2015, Plaintiff texted Weber, "Hope you're having a good weekend Bruce!! :-)". Plaintiff included a picture of <u>himself posing shirtless and accentuating his groin.</u> (Brown Decl., Ex. AA).

- On May 29, 2015, Plaintiff again texted Weber a picture of himself shirtless and with much of his upper groin area exposed, *suggesting he was naked*, and wrote, "Would love to FaceTime and catch up soon! :-) . . . I come back Sunday night. I'm here next Monday, and Tuesday, then on wed I leave for LA for the month of June. Then back to NY on July 8th." Weber responded: "Ok well give me a call anytime and if it's good I can talk- happy for you things are working out and you look great!" (Brown Decl., Ex. AA).

- On April 10, 2016, Kanner emailed Weber about Plaintiff and attached 6 pictures of Plaintiff. (Brown Decl., Ex. BB).

- On April 10, 2016, Weber respond to Kanner that Plaintiff was "handsome" and that he was looking forward to meeting one of Kanner's other models named Dan. Weber then wrote a follow up response that the model named Dan should call him. (Brown Decl., Ex. CC-DD).

C.  <u>**Evidence Regarding Employment Allegations**</u>

It is undisputed that the portrait session did not involve any employment prospect. Weber agreed to take some photos of Plaintiff for Plaintiff's modeling book and not for any employment or referral opportunity, as a favor to Kanner. Weber Tr. 96:16-97:18. Plaintiff also understood that his photoshoot with Weber did not involve any employment opportunity. To wit, when Plaintiff was asked about the portrait session, Plaintiff testified, "It was not for a specific job." Boyce Tr. 148:1-8.

# III.
# ARGUMENT

## A.    The Applicable Standard

Summary judgment is warranted when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Id.*, 477 U.S. at 249-50 (non-moving party must present "significant, probative evidence on which a reasonable fact-finder could decide in its favor.").

When, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims, or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett***,** 477 U.S. 317, 323 (1986); *Farid v. Smith,* 850 F.2d 917, 924 (2d Cir.1988)). In addition, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial and cannot defeat a motion for summary judgment." *Salahuddin,* 467 F.3d at 281. If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact. Fed.R.Civ.P. 56(e*). Salahuddin,* 467 F.3d 263 at 272-73 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment. *Salahuddin,* 467 F.3d 263 at 73. To defeat a motion for summary judgment, the nonmovant must advance more

than a "scintilla of evidence," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and

demonstrate more than "some metaphysical doubt as to the material facts," *Zenith Radio Corp.*,

475 U.S. at 586.

**B.     Summary Judgment Should Be Granted On Plaintiff's Employment Claims**

Plaintiff's Counts I-IV assert claims for damages under the NYSHRL and NYCHRL based

on Plaintiff's allegation that Weber touched him inappropriately during their December 2014

portrait session (the portrait session that Weber did as a favor to Kanner, Plaintiff's agent, as

demonstrated above). In Counts I and II, Plaintiff alleges that Weber and Little Bear acted as

"employment agencies," and discriminated against and harassed Plaintiff at the portrait session in

connection with their work as "employment agencies." In Counts III and IV, Plaintiff alleges that

Weber and Little Bear acted as "potential employers," and discriminated against and harassed

Plaintiff at the portrait session in connection with their roles as Plaintiff's "potential employers".

Counts V and VI are claims against Weber and Little Bear for aiding and abetting Counts I-IV

**1.     Counts I-IV Fail as a Matter of Law Because Plaintiff Cannot Establish
          a *Prima Facie* Case of Discrimination or Harassment**

Even assuming *arguendo* Plaintiff could establish that Weber or Little Bear were

"employment agencies" or "potential employers,"[13] to make a *prima facie* case of discrimination,

Plaintiff must produce evidence that shows that: (1) he belongs to a protected class; (2) he was

qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances

surrounding the adverse employment action give rise to an inference of discrimination. *See*

---

[13] Defendants do not believe they meet the definitions of "employment agency" or "potential employer" under the relevant statutes. *See also Scaglione v. Chappaqua Cent. Sch. Dist.,* 209 F.Supp.2d 311, 316 (S.D.N.Y.2002) ("There are very few cases invoking 42 U.S.C. § 2000e-2(b) ... and the few that do almost invariably involve an entity that is indisputably an 'employment agency.'").

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973);[14] *Holcomb v. Iona Coll.,* 521 F.3d

130, 138 (2d Cir. 2008). "Although the burden of meeting the *prima facie* case is 'de minimis,'

Plaintiff must adduce some admissible evidence that would support [his] claims." *Hill v. Rayboy-*

*Brauestein,* 467 F.Supp.2d 336, 356 (S.D.N.Y. 2006). Similarly, to establish a *prima facie* case of

sexual harassment, an employee must show that "(1) []he belongs to a protected group, (2) []he

was the subject of unwelcome sexual harassment, (3) the harassment was based on [his] gender,

(4) the sexual harassment affected a term, condition, or privilege of employment, and (5) the

employer knew or should have known of the harassment and failed to take remedial action." *Pace*

*v. Ogden Servs. Corp.*, 257 A.D.2d 101, 692 N.Y.S.2d 220, 223 (3rd Dep't 1999) (citations

omitted). *See also Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 416 (2d Cir. 2011)

(plaintiff must "produce not simply some evidence, **but sufficient evidence** to support a rational

finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and

that more likely than not discrimination was the real reason for the [adverse employment action].")

(internal quotation marks omitted)(emphasis added).

Here, the evidence falls far short of what Plaintiff needs to establish employment

discrimination or harassment, because: (1) Plaintiff cannot be deemed to be qualified for a position

that he never applied for, (2) Plaintiff cannot be deemed to have suffered an adverse employment

action if Plaintiff never applied for a position, and (3) no inference of employment discrimination

can exist because Plaintiff never applied for a position. Indeed, it is undisputed that the portrait

---

[14] Claims under the NYSHRL and NYCHRL are analyzed under the *McDonnell Douglas* burden
shifting analysis. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir.2010) (holding that
*McDonnell Douglas* applies to discrimination claims brought under the NYSHRL); *Barounis v.
N.Y.C. Police Dep't*, No. 10 Civ. 2631 (SAS), 2012 WL 6194190, at *10 (S.D.N.Y. Dec. 12, 2012)
("[T]he Second Circuit has established that discrimination claims under the… NYCHRL are
subject to the same burden-shifting framework that the Supreme Court articulated in McDonnell
Douglas for Title VII claims.") (internal quotation marks and citations omitted).

session was not an application for work, employment, or referral. The undisputed evidence is that

Weber (not Little Bear) agreed to shoot Plaintiff purely as a favor to Plaintiff's agent, Kanner, and

not for any work, employment, or referral-related reason. Plaintiff concedes the portrait session

with Weber in December 2014 "was not for a specific job."[15] For this reason, the Court should

enter summary judgment dismissing Counts 1 through 4 of Plaintiff's FAC.[16]

## 2. Counts I-IV Fail as a Matter of Law Because Defendants Were Not Employment Agencies or Employers *as to Plaintiff*

Assuming *arguendo* that either Weber or Little Bear were found to meet the definition of

an employment agency or potential employer, there is no dispute that neither Weber nor Little

Bear acted in those roles <u>as to Plaintiff</u>. It is undisputed that (1) Weber agreed to the portrait session

as a favor to Kanner, Plaintiff's agent, and (2) Plaintiff conceded his portrait session with Weber

in December 2014 "was not for a specific job."[17] There is thus no evidence that Weber or Little

Bear acted as an employment agency or potential employer <u>as to Plaintiff</u> and summary judgment

should be granted dismissing Counts I-IV. *See Langhorne v. Port Authority of New York*, No. 03

CIV 4610, 2005 WL 3018265 (S.D.N.Y. Nov. 10, 2005) ("Both statutes [the *NYSHRL and*

---

[15] Boyce Tr. 147:5-148:8.

[16] *See Farzan v. Wells Fargo Bank, N.A.*, No. 12 CIV. 1217 RJS JLC, 2013 WL 6231615, at *24 (S.D.N.Y. Dec. 2, 2013), *subsequently aff'd sub nom., Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015) (granting summary judgment for defendants on plaintiffs NYSHRL and NYCHRL discrimination claims where "[plaintiff] cannot show that he actually applied for and was rejected for a . . . position" because "[b]y definition, [a person] who . . . never applied to begin with— cannot have been rejected under circumstances which give rise to an inference of discrimination.") (internal quotations and citations omitted); *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12 CIV. 234 BMC, 2014 WL 5587349, at *27 (E.D.N.Y. Nov. 3, 2014), *aff'd sub nom. Bright v. Coca-Cola Refreshments USA, Inc.*, 639 F. App'x 6 (2d Cir. 2015) (granting summary judgment for defendant on discrimination claims where plaintiff never applied for the position as issue). *See also Erlach v. New York City Bd. of Educ.*, No. CV 94 4239 (RJD), 1996 WL 705282, at *10 (E.D.N.Y. Nov. 26, 1996), *aff'd*, 129 F.3d 113 (2d Cir. 1997) ("Obviously, the plaintiff cannot satisfy the fourth prong of the standard if she is not employed at the time of the alleged actions.").

[17] Boyce Tr. 147:5-148:8.

NYCHRL] permit suit against an 'employment agency.' But this provision too is of no assistance to Langhorne because such suits are permitted only for discrimination by an employment agency in 'acting upon applications for its services or in referring an applicant or applicants . . . to an employer or employers.' N.Y. Exec. Law § 296(1)(b); N.Y.C. Admin. Code § 8-107(1)(b). There is no allegation that RHI discriminated against Langhorne in either of these respects."); *see also* N.Y.C. Admin. Code § 8-107(1)(a) (requiring that the discriminatory practice by an employer relate to a "refus[al] to hire…such person…or to discriminate against such person in compensation or in terms, conditions or privileges of employment."); N.Y. Exec. Law § 296.1(a) (same).   *See also Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *__ (S.D.N.Y. Jan. 28, 2019) ("Crucially, the employer relationship must be alleged as to the aggrieved party (here, Canosa), not the alleged bad actor (here, Weinstein) . . . The AC, tellingly, does not allege that Robert Weinstein or the directors had any power whatsoever over Canosa's hiring or firing, her salary, or her work. These defendants are therefore not liable under an employer theory").

### 3.    Plaintiff's Aiding And Abetting Claims Fail as a Matter of Law

Counts V and VI of the FAC, which allege that Weber and Little Bear aided and abetted the alleged employment discrimination against him should be dismissed because, as described above, Plaintiff's employment based claims fail. In addition, Plaintiff's aiding and abetting causes of action are premised on the alleged conduct of Weber and Little Bear. FAC, ¶¶ 104, 113 ("Mr. Weber and Little Bear implicitly conditioned employment opportunities for Mr. Boyce on his acceptance of Mr. Weber's sexual advances."). However, Weber and Little Bear cannot be aiders or abettors of their own alleged actions. *See Hicks v. IBM*, 44 F. Supp. 2d 593, 600 (S.D.N.Y. 1999) ("[T]he primary actor cannot be an aider and abettor of his own actions."); *see also Strauss v. New York State Dep't Of Educ.*, 26 A.D.3d 67, 73, 805 N.Y.S.2d 704 (3d Dep't 2005) ("[a]n

individual cannot aid and abet his own alleged discriminatory conduct."). Thus, summary judgment should be granted dismissing Counts V and VI of the FAC.

## C.   The Court Should Grant Summary Judgment On the Sex Trafficking Claim Because Weber Did Not Recruit or Entice Plaintiff To the Photoshoot[18]

Plaintiff asserts a private right of action, under 18 U.S.C. § 1595, as an alleged victim of a violation of the Sex Trafficking Act, 18 U.S.C. § 1591(a)(1). FAC, ¶¶ 17-20. To prevail at trial, Plaintiff must prove that Weber knowingly: "(1) *recruited, enticed*, harbored, transported, provided, obtained, or maintained [Plaintiff] by any means; (2) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud . . . or any combination of such means will be used; (3) to cause [Plaintiff] to engage in a commercial sex act." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018) (emphasis added).[19] As for the first element, the FAC pleads only that Weber allegedly "recruited and enticed" him.[20] FAC at. ¶ 120. *Noble* recognizes a key sequencing requirement of the Sex Trafficking Act. Because the sex trafficker must know, when he "entices" or "recruits" the victim, *that in the future*, fraud or force "*will be used*" to *cause* a commercial sex act, it necessarily follows that the "enticement" or "recruitment" must *precede* the planned commercial sex act. 18 U.S.C 1951(a)(1). *See Shuvalova v. Cunningham,* No. 10-CV-02159, 2010 WL 5387770, at *4 (N.D. Cal. Dec. 22, 2010) (emphasis added) (plaintiffs failed to

---

[18] Weber believes that Plaintiff failed to meet all the elements of his Sex Trafficking Act claim, but is making only one argument on this claim at this time: that it is undisputed that he did not "recruit" or "entice" Plaintiff to the portrait session, as an essential element required by the statute.

[19] Because the conduct alleged predates the May 29, 2015 amendment of 18 U.S.C. § 1591, the 2014 version, effective from December 23, 2008 to May 28, 2015 governs. *Ditullio v. Boehm*, 662 F. 3d 1091, 1102 (9th Cir. 2011) ("§ 1595 cannot be applied retroactively to create liability for conduct that occurred before [the statute was amended].")

[20] Section 1591 does not define "recruits" or "entices". Relying on certain dictionary definitions, Judge Sweet in *Noble* found that (1) "recruit" means "to persuade to do or help with something," *Noble*, 335 F. Supp. 3d at 526 n. 9; and (2) "entice" means "to attract artfully or adroitly or by arousing hope or desire," or "[to] attract or tempt by offering pleasure or advantage." *Noble*, 335 F. Supp. 3d at 517, 526 n. 9.

state a claim for trafficking, as opposed to forced labor, where the only allegations regarding defendants' conduct prior to plaintiffs' arrival at the property were that one defendant "promised to take care of [plaintiffs] in a loving home") (internal quotation marks omitted).

As shown above, however, no reasonable juror can find that Weber recruited or enticed Plaintiff to the portrait session (which was indisputably a favor to Kanner, Plaintiff's agent) within the meaning of Section 1951(a)(1). To the contrary, the evidence repeatedly demonstrates that: (1) Plaintiff engaged in an unprecedented, relentless, multi-year campaign to entice Weber to photograph him (that continued for over a year and a half after the portrait session), and (2) Weber never initiated conversations about photographing Plaintiff and only finally agreed to the portrait session as a favor to Plaintiff's agent.

Indeed, there is no genuine dispute that Plaintiff relentlessly sought out a photoshoot with Weber for years, not the other way around. Both Plaintiff and his agent acknowledge this fact. Todd Tr. at 169:8-18 ("Q. Have you ever had a model, asking you, relentlessly, year after year in so many different ways, to get you with one particular person? A. Not that I can recall."); Boyce Tr. at 135:20-136:2 ("Q. Would you agree that it was something that you, as David Todd said, relentlessly pursued year after year?  A. I pursued it, yes, I did.") (Brown Decl., Ex. A).

There is also no genuine dispute that Plaintiff's photoshoot occurred only when Weber relented and agreed to Kanner's request (Plaintiff's agent) as a favor given their professional history and Kanner's assistance with a Barney's photoshoot discussed above. *See* Weber Tr. 88:8-14 ("His agent, Jason Kanner, called me and asked me if I would do him a favor and see him and take his photograph as a favor to him."); s*ee also* email from Kanner to Weber, dated December 16, 2014 (Brown Decl., Ex. X) ("Thank you for seeing" Plaintiff).

Given the foregoing evidence, no reasonable juror could conclude that Weber "recruit[ed]" or "entice[d]" Plaintiff to the portrait session. It was Plaintiff who, persistently and repeatedly, by himself and by others at his direction, tried to initiate a professional relationship with Weber, not the other way around. Because it is undisputed that there is no evidence of any enticement or recruitment of Plaintiff by Weber before the portrait session, a required element of the Sex Trafficking Act, Plaintiff cannot prove his claim and summary judgment should be granted. *See Salahuddin,* 467 F.3d at 281 ("where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial and cannot defeat a motion for summary judgment.").

The record also demonstrates that this case is nothing like the allegations in complaints that survived motions to dismiss in a series of cases in this district against notorious Hollywood producer Harvey Weinstein. In the first of those cases, *Noble,* [21] the court found that the element of "entice[ment]" and "recruit[ment]" was plausibly alleged based on allegations of Weinstein's specific fraudulent promises to the plaintiff. *Noble*, 335 F. Supp. 2d at 517. The plaintiff's allegations, taken as true, sufficiently pled that Weinstein "recruited" or "enticed" plaintiff to his hotel room, where he allegedly then used "fraud or force" to cause a commercial sex act. However, in sharp contrast to the record here, with respect to enticement or recruitment, the plaintiff in *Noble* alleged that: (i) Weinstein approached plaintiff at a social function and told plaintiff he wanted to know more about her acting aspirations; (ii) Weinstein told plaintiff he had a particular acting role in a film in mind for her; (iii) Weinstein introduced plaintiff to an executive in his production

---

[21] In *Noble*, Judge Sweet recognized that "[Noble's] allegations present an extension of an element of [the Sex Trafficking Act] on which there is little to no prior authority." *Id.* at *10 (emphasis added) citing *Estrada-Tepal*, 57 F. Supp. 3d at 171 ("the [Court] is not aware of an application of [the Sex Trafficking Act] to anyone other than an individual directly and substantially involved in an underlying sex trafficking scheme.").

company, and repeated to her that the role would be good for her; (iv) the executive instructed plaintiff to write a narrative about herself and provide a film reel and assured plaintiff that she would send the narrative and film reel to Weinstein, and would contact Plaintiff about the next steps for the film role, and (v) Weinstein approached plaintiff and invited her to his hotel room to view the film reel and discuss the role he allegedly had in mind for her. *Noble*, 335 F. Supp. 3d at 511-12.

Notably different from the record here, the complaints in the "*Weinstein* cases" [22] do not allege *any affirmative acts by any of the plaintiffs*, who are alleged to be passive players **lured by**

---

[22] In the four post-*Noble* Weinstein cases involving motions to dismiss that were denied, none of the defendants appear to have challenged the "entices" or "recruits" element. In any event, as in *Noble*, plaintiffs allege that Weinstein took affirmative steps to lure plaintiffs with promises of movie roles or other professional rewards, and then violently assaulted them. *See Huett v. The Weinstein Co.*, 2018 WL 6314159 at *2 (S.D.N.Y. Nov. 5, 2018) (Weinstein arranged for private meeting with plaintiff by "promis[ing] her participation and a role in an entertainment project). The *Huett* Complaint further alleges that Weinstein provided plaintiff with access to other executives who would provide her with acting or modeling roles, they met to discuss Weinstein's interest in her acting career, they discussed specific criterion for the role, and Weinstein asked her to join him in his hotel room to continue the discussion. [Dkt # 1, ¶¶ 11-13]. *See Canosa v. Ziff*, 2019 WL 498865, at 2 (Weinstein "directed, arranged, and paid for plaintiff" to fly to meetings, in among other places, a New York hotel under the guise of wanting to discuss making plaintiff part of his production team and making a film pitched by plaintiff); *see Canosa* Amended Complaint [Dkt # 96, ¶ 34]. The *Canosa* Amended Complaint further alleged that it was Weinstein who approached plaintiff, and that he flew her around the world ostensibly to work on projects. [*Id.* ¶¶403-07]. The *Canosa* Amended Complaint alleges that, for the various meetings, Weinstein flew plaintiff to New York from Toronto, Malaysia, and Budapest. *Id.; Geiss v. The Weinstein Co.*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019) (Weinstein lured plaintiff away from an audition to his private office by telling her he was casting a role that she had the "right look" for). *See* Geiss First Amended Complaint. [Dkt. #140, ¶¶ 93-96]; *David v. The Weinstein Co.*, 2019 WL 6954363 (S.D.N.Y. Dec. 19, 2019) (Weinstein offered to assist plaintiff with her acting career, asked her for her phone number, invited her to attend award show parties, maintained regular contact with her for years, and met to discuss her having a role in a Marco Polo television series). *See* Third Amended Complaint. [Dkt. #161, ¶¶ 24-28]. *Ardolf v. Weber*, 332 F.R.D. 467 (S.D.N.Y. 2019), a post-*Noble* case against Weber, is similarly a complete mismatch with the evidence here. The allegations by the plaintiffs in *Ardolf* included (1) personal acts by Weber, (2) that Weber got them booked for brand or editorial campaigns, and (3) that Weber had ultimate control over their careers, including whether they could get modeling jobs. There is no evidence of any of those things occurred here. Indeed, to the contrary, the evidence is that Weber does not decide which models

Weinstein based on promised movie roles and the like. These allegations stand in stark contrast to the case at bar which in which the facts clearly demonstrate that it was Plaintiff who took numerous affirmative acts year after year to pursue Weber, not the other way around. Indeed, there is a **significant** disparity to the Weinstein allegations which merely survived motions to dismiss.  Here, there is no evidence that Weber did anything to entice Plaintiff to the photoshoot, let alone made any explicit promises to him to lure him to the photoshoot as in the *Weinstein* cases. To the contrary, after the portrait session in December 2014, Plaintiff and his agents continued to barrage Weber with photos and texts. Thus, post-portrait session events further confirm the one-way pursuit—Plaintiff pursuing Weber, not the other way around. If recruitment and enticement is found here, then we have written this element—the *actus reus*—out of the statute.  *See Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 447 (E.D.N.Y. 2013) ("Plaintiff has failed to demonstrate or explain how Defendant recruited, harbored, provided or obtained her services, a necessary element to prove trafficking under this statute … **Without this element, Plaintiffs' trafficking claim under this statute is nothing more than her forced labor claim restated**.") (emphasis added).

Given the undisputed evidence here, and the purpose of the Sex Trafficking Act,[23] this Court should grant summary judgment dismissing Plaintiff's Sex Trafficking Act claim.

---

even which models his own clients hire—his clients decide. *See e.g.*, Weber Tr. 182:1-184:19; 194:7-195:3; Todd Tr. 73:6-11; 75:3-14.

[23]The Sex Trafficking Act "criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain." *United States v. Evans,* 476 F.3d 1176, 1179 (11th Cir. 2007), *cert. denied,* 552 U.S. 878. *see also United States v. Todd*, 627 F.3d 329, 333 (9th Cir. 2010) (noting that, in enacting the Sex Trafficking Act, Congress focused on "the traffic in the sexual services of women based on importing women from around the world by force or fraud"). As such, the Sex Trafficking Act is distinguishable from laws governing gender-motivated acts, *see Todd*, 2012 WL 2952084, at *6 ("commercial sex acts are . . . distinguishable from laws governing gender-motivated crimes of violence").

## IV.
## CONCLUSION

For all the foregoing reasons, the Court should grant Defendants' motion for summary judgment and dismiss all counts of Plaintiff's FAC.

Dated: February 20, 2020

By: /s/ Daniel Brown
**Sheppard Mullin Richter & Hampton LLP**
30 Rockefeller Plaza
New York, NY 10112
Email: dbrown@sheppardmullin.com
Telephone:  (212) 634-3095
Facsimile:  (212) 655-1768
*Attorneys for Defendant Bruce Weber*

By: /s/ Jayne C. Weintraub
**Sale & Weintraub, P.A.**
2 South Biscayne Blvd.
One Biscayne Center – 21st Floor
Miami, Florida 33131
Email: jweintraub@saleweintraub.com
Telephone:  (305) 374-1818

By: /s/ Jonathan Etra
**Nelson Mullins Broad and Cassel**
2 South Biscayne Blvd.
One Biscayne Center – 21st Floor
Miami, Florida 33131
Email: jonathan.etra@nelsonmullins.com
Telephone:  (305) 373-9447
*Attorneys for Defendant Bruce Weber*