UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JASON BOYCE,

        Plaintiff,

   v.

BRUCE WEBER and LITTLE BEAR, INC.

        Defendants

Case No.  1:19-cv-03825-JMF

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' RULE 56.1
STATEMENT**

---

      Pursuant to Rule 56.1 of the Court's Local Civil Rules, Plaintiff Jason Boyce ("Boyce" or "Plaintiff") by and through the undersigned counsel, submits the following responses to Defendants' statement of undisputed materials facts along with Plaintiff's Counterstatement of Fact in support of Plaintiff's Opposition for Defendant Bruce Weber ("Weber") and Little Bear Inc.'s ("Little Bear") (collectively, "Defendants") Motion for Summary Judgment dismissing the complaint of plaintiff Jason Boyce.

## DEFINITIONS AND CITATION FORMAT

      This Rule 56.1 Statement adopts and incorporates the definitions and abbreviations used in the Motion. Plaintiff use the following citation forms:

A.  Citations to the Declaration of Daniel Brown, dated February 20, 2020, are referred to as "Brown Decl.", followed by the cited paragraph number and/or exhibit thereto.

B.  Citations to the Declaration of Arick Fudali, dated March 12, 2020, are referred to as "Fudali Decl.", followed by the cited paragraph number and/or exhibit thereto.

C.  Citations to the transcript of the deposition of Bruce Weber, dated September 19, 2019, are referred to as "Weber Tr.," followed by the cited page and line number. (Fudali Decl., Ex. A.)

D.  Citations to the transcript of the deposition of David Todd, Plaintiff's agent, dated March 5, 2019, are referred to as "Todd Tr.," followed by the cited page and line number. (Fudali Decl., Ex. C.)

E.  Citations to the transcript of the deposition of Plaintiff Jason Boyce, dated July 9, 2019, are referred to as "Boyce Tr.," followed by the cited page and line number. (Fudali Decl., Ex. D.)

F.  Citations to the transcript of deposition for Little Bear's 30(b)(6) witness, Jonathan Bernstein, dated September 23, 2019, are referred to as "Bernstein Tr.," followed by the cited page and line number. (Fudali Decl., Ex. E.)

G.  Citations to the transcript of deposition for Little Bear's 30(b)(6) witness, Elizabeth Murphy, dated September 23, 2019, are referred to as "E. Murphy Tr.," followed by the cited page and line number. (Fudali Decl., Ex. F.)

H.  Citations to the transcript of deposition for Nan Bush, dated December 18, 2019, are referred to as "Bush Tr.," followed by the cited page and line number. (Fudali Decl., Ex. H.)

I.  Citations to the transcript of the deposition of Mark Ricketson, dated July 23, 2018, are referred to as "Ricketson Tr.," followed by the cited page and line number. (Fudali Decl., Ex. I.)

J.   Citations to the transcript of the deposition of Dawn Tomassone, dated September 25, 2019, are referred to as "Tomassone Tr.," followed by the cited page and line number. (Fudali Decl., Ex. S).

## PLAINTIFF'S RESPONSES TO DEFENDANTS'

## STATEMENT OF UNDISPUTED FACTS

I.   **Plaintiff's Complaints**

1.      On December 1, 2017, Plaintiff commenced this action by filing a complaint in New York state court (the "Original Complaint") against his modeling agency, Soul Artist Management; his New York agent, Jason Kanner ("Kanner"); Weber, a fashion photographer; and Little Bear, a production company. (Dkt. No. 1-1); Little Bear's Response to Plaintiff's Interrogatory No. 11. (Brown Decl., Ex. D).

**Plaintiff's Response:** Undisputed.

2.      In the Original Complaint, Plaintiff asserted five employment-based causes of action against Defendants under the New York State Human Rights Law ("NYSHRL") and York City Human Rights Law ("NYCHRL"): (1) sexual harassment and discrimination as employment agencies (Counts I and II), (2) sexual harassment and discrimination as potential employers (Counts III and IV), and (3) aiding and abetting these violations (Count V). (Dkt. No. 1-1).

**Plaintiff's Response:** Disputed. There are six employment-based causes of action against Defendants.  Count VI is an additional aiding and abetting claim. (Dkt. No. 1-1.)

3.      On December 21, 2018, Plaintiff filed a First Amended Complaint ("FAC"). (Dkt. No. 1-2).

**Plaintiff's Response:** Undisputed.

4.　　The FAC differs from the Original Complaint by adding the seventh claim against Weber for violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591 and its civil remedy provisions. (FAC, ¶¶ 117-135).

**Plaintiff's Response:** Undisputed.

5.　　In all other respects, the FAC is identical to the Original Complaint, as demonstrated by a redlined version comparing the FAC with the Original Complaint. (Brown Decl., Ex. E).

**Plaintiff's Response:** Undisputed.

6.　　On April 29, 2019, the case was removed to federal court. (Dkt. No. 1).

**Plaintiff's Response:** Undisputed.

## II.　　Weber is a Fashion Photographer

7.　　Weber is a fashion photographer who has worked in the industry for over 50 years. Weber Tr. 50:22-51:2. (Brown Decl., Ex. B).

**Plaintiff's Response:** Undisputed.

8.　　Weber has photographed thousands of models over his career. Weber Tr. 318:20-319:13. (Brown Decl., Ex. B).

**Plaintiff's Response**: Undisputed.

9.      Jason Kanner ("Kanner") was Plaintiff's New York-based agent. Todd Tr. 197:24-198:21. (Brown Decl., Ex. C).

**Plaintiff's Response**: Undisputed.


10.     David Todd ("Todd") was Plaintiff's California-based agent. Todd Tr. 197:24-198:21. (Brown Decl., Ex. C).

**Plaintiff's Response**: Undisputed.


11.     Weber had no authority or power to select or hire models for campaigns, and the decisions about which models to hire were made by the brands or magazines themselves. (*See* Weber Tr. 182:1-184:19 ("Q. I am gathering from your testimony that it's your statement or your testimony that Mike Jeffries had the ultimate control over which models were invited to the shoot? A. Yes. It's like that for pretty much me and every other photographer for whoever you are working for.") (Brown Decl., Ex. B); 194:7-195:3 ("Q. Were there any companies that hired you that actually gave you full authority over the shoot, the campaign, the selection process? A. No, unfortunately.") (Brown Decl., Ex. B); Todd Tr. 73:6-11; 75:3-14 ("Q. Because the bottom line was, it wasn't [Weber] that made the ultimate decision; it was the brand? A. Correct. He has an influence -- Q. Okay. A. But at the end of the day, the brand made the decision on that specific job.") ("Q. Would you agree that that's the same for any brand, the most that a photographer, included Bruce Weber could do, is make a recommendation? A. Right, yes. Q. They don't get to make the ultimate decision, that's the brand's decision? A. Correct.") (Brown Decl., Ex. C).

**Plaintiff's Response**: Disputed. Defendants controlled the casting process of models for campaigns. (*See* Plaintiff's Counterstatement of Fact Section I.B.)  Weber had a "huge influence on the shoot to hire a model." (Todd Tr. 69:15-70:10, Fudali Decl., Ex. C.)  Weber started the careers of many models, and Weber had the power to hire a model for a particular campaign. (*Id.* at 70:12-73:4.)  Big photographers like Weber have influence on model casting, because they can dictate which models they want to the client. (*Id.* at 66:16-67:10) ("A photographer, if it's –a known photographer that has influence on the model casting, then that can be a little bit different… if it's a big photographer, he can go to the production team and say I want this model.").

Weber selected which photographs, and therefore which models were featured, to send to clients like Abercrombie & Fitch or Vogue and thus was closely involved with the model selection process for these campaigns. (*See* Weber Tr. 276:14-281:24, Fudali Decl., Ex. A) ("Q: [F]or Vogue, much like the Abercrombie & Fitch, you would select the photos that you liked and those would be the ones that get sent to the art director, and then the art director would make his cuts and edits, correct? A: Yea, the same thing for Vogue in a way.").  Defendants were involved with the casting for Abercrombie & Fitch and Weber would sometimes select certain models for a casting through their agency. (*Id.* at 171:20-179:21.)  After a casting, Weber received a binder with all the models from the casting. (Tomassone Tr. 20:22-22:9, Fudali Decl., Ex. S.)  Weber then narrowed down the models in the binder to send to the client. (*Id.* at 22:15-23.)  The client then selected which models to use for their campaign from the selection of models that Weber cultivated. (*See id.* at 23:1-4.)  Weber had the authority to add models to the binder and remove models from the binder before sending to the client. (*See id.* at 23:5-20.)  Weber had the authority to override his casting director's decision to include someone in the binder, even if she disagreed with his decision. (*See id.* at 97:25-98:22.)

Weber would "campaign" or "fight" for certain models to Mike Jefferies, the CEO of Abercrombie & Fitch. (Weber Tr. 183:21-184:1, Fudali Decl., Ex. A.) Weber told clients (*e.g.* Vogue magazine) that he wanted to photograph a certain actress. (*Id.* at 194:7-23.) Weber also had the authority to select models for his artistic works and being featured in such works helps a model's career. (*Id.* at 195:15-198:19.)

12.     It is very common in the industry for an agent to arrange for a photographer to take pictures/portraits of a model for the model to include in his or her portfolio, which is then used by the agent to try to market the model. For example, shortly before the portrait session with Weber, Plaintiff was photographed by Darren Tieste; Plaintiff admitted that those photographs were not for a job, they were for his modeling book/portfolio. Boyce Tr. 93:1-9; 98:17-24. (Brown Decl., Ex. A).

**Plaintiff's Response**: Disputed. While Boyce was photographed by Darren Tieste for his book, Defendants' lack any citation to their proposition that such a practice was "very common" in the industry. Weber has never conducted a "portrait session" at Little Bear studios. (E. Murphy Tr. 34:24-35:7, Fudali Decl., Ex. F) ("Q: What about a portrait session? A: Like a commissioned portrait session? I mean, if Bruce – I have never seen one happen there."). Additionally, the photoshoot between Boyce and Weber was not a "portrait session" but rather a "go-see." (*See* Plaintiff's Response to Defendants' Fact 72.)

13.     Similarly, Plaintiff was photographed in 2011 by photographer Douglas English, not for a job, but for his modeling book, Boyce Tr. 71:17-20; 74:20-24, and by photographer Scott

Hoover, not for a job, but for Plaintiff's modeling book, Boyce Tr. 264:8-19. (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.

### III.   Plaintiff is a Failed Model

14.   Plaintiff conceded that from 2009 through 2014, he was not making it as a model and that had absolutely nothing to do with Bruce Weber. Boyce Tr. 55:4-8.

**Plaintiff's Response**: Disputed.  Boyce "shot with some really good photographers that believed in him and really wanted to work with him" and "booked some cool jobs" like American Crew and MAC Cosmetics and had some success in the industry.  (Todd Tr. 200:1-10, Fudali Decl., Ex. C.)  Plaintiff testified he was able to make some money modeling and did projects that he loved.  (Boyce Tr. 31:9-13, 55:18-23, Fudali Decl., Ex. D.)

15.   Plaintiff testified that he was never able to support himself modeling. Boyce Tr. 31:9-21. (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.

16.   From 2009 through 2014, Plaintiff never made more than $15,000 in any year from modeling. Boyce Tr. 53:9-56:8. (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.

17.   In fact, some years, he made no money at all modeling, as in 2014. Boyce Tr. 96:1-2. (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.

18.     Todd, Plaintiff's California agent, testified that Plaintiff's modeling career was like a flat line on a graph. Todd Tr. 167:17-24. (Brown Decl., Ex. C).

**Plaintiff's Response**: Undisputed that Todd testified as to this.  However, Boyce "shot with some really good photographers that believed in him and really wanted to work with him" and "booked some cool jobs" like American Crew and MAC Cosmetics and had some success in the industry.  (Todd Tr. 200:1-10, Fudali Decl., Ex. C.)

### IV.     Plaintiff's Obsession with Weber Dates as Far Back as 2009-2010

19.     Plaintiff began pursuing Weber as early as 2010, and his pursuit was relentless and continued year after year. Boyce Tr. at 120:20-121:8; 135:20-136:2. (Brown Decl., Ex. A).

**Plaintiff's Response**: Disputed.  Plaintiff disputes that his contact with Weber seeking employment was "relentless."  Boyce sought Weber out as a potential employer because he wanted to work with him because of Weber's status and influence in the industry.  (Boyce Tr. 121:4-8, Fudali Decl., Ex. D.)

Boyce's "pursuit" of Weber was appropriate.  Being photographed by Weber gives a model "street cred" with other clients and can be a huge boost to a model's portfolio.  (*Id*. at 362:6-12.) Weber admits that being featured in one of his artistic works would boost a model's career.  (Weber Tr. 195:15-198:19, Fudali Decl., Ex. A.)   Weber started the careers of many models, and Todd recalled instances where Weber had the power to hire a model for a particular campaign.  (Todd Tr. 70:12-73:4, Fudali Decl., Ex. C.)

Todd believed that Weber was always interested in Boyce, based on Weber's taste and the type of models Weber liked. (*Id.* at 111:15-112:12.)   Boyce was constantly told that his look would be great for Weber.   (*Id.* at 131:14-23) (Todd: "Everyone would always say, oh, you would be great for Bruce Weber, to [Boyce].  And I think he really was hoping that Bruce would hire him."). The chance to work with Weber was what both Boyce and his agents wanted as it was advantageous for both parties.  (*See* Boyce Tr. 130:8-13, Fudali Decl., Ex. D.)

It was very common for agents to reach out to Weber with model photos as part of the application process.  In fact, Weber received a "barrage" of constant messages from agents of their models.  (E. Murphy Tr. 53:17-54:8, Fudali Decl., Ex. F) ("Q: can Mr. Weber ask for specific people to show up for [castings]? A: The castings, he might.  I mean, just because of the barrage of – I mean, I can't stand the fact that he has a cell phone.  You know he gets barrages from these agents directly.").  Agents continued to send photos of their models to Weber because Weber would regularly book modeling work through these communications.  (*See e.g.* Fudali Decl., Ex. DD.)

20.    Plaintiff's agent, David Todd, testified that Plaintiff's relentless pursuit of Weber, year-after-year, was unlike anything he had ever seen in modeling; he could not think of any other instance (in over 20 years of being an agent) of a model pursuing a photographer so relentlessly as Plaintiff pursued Weber. Todd Tr. at 169:8-18 ("Q. Have you ever had a model, asking you, relentlessly, year after year in so many different ways, to get you with one particular person? A. Not that I can recall. Q. Very unusual; right? A. Yes.") (Brown Decl., Ex. C).

**Plaintiff's Response:** Undisputed that Todd testified this, however Plaintiff disputes that his contact with Weber seeking employment was "relentless." (*See* Plaintiff's Response to Defendants' Fact 19.)

21.     Plaintiff did not dispute Todd's characterization of Plaintiff's pursuit of Weber, admitting he pursued Weber for years. *See* Boyce Tr. 135:20-136:2 ("From a professional perspective, would you agree that it had been -- the meeting was something that you had aspired to for years? A. Yes. Q. Would you agree that it was something that you, as David Todd said, relentlessly pursued year after year? A. I pursued it, yes, I did.") (Brown Decl., Ex. A). *See also* Boyce Tr. at 120:20-121:8 (Q. So 2009, '10, '11, '12, we've talked about '13 and '14, the nudes, nothing comes of, you're not shot or seen by Bruce Weber. Agreed? A. Agreed. . . . Q. Why were you still pursuing Bruce Weber after 5 years? A. I wanted to shoot with him.") (Brown Decl., Ex. A).

**Plaintiff's Response**: Disputed.  Plaintiff disputes that his contact with Weber seeking employment was "relentless."  (*See* Plaintiff's Response to Defendants' Fact 19.)  Boyce wanted to meet with Weber because Boyce believed it would help his modeling career.  (Boyce Tr. 100:6-9, Fudali Decl., Ex. D) ("Q: What do you remember about Bruce Weber, why you wanted to get in front of him? A: I knew that he made the careers of a lot of successful male models.")

22.     Plaintiff "believed" that if he could just get in front of Weber, "the heavens would open" and after years of rejection, job opportunities would suddenly appear. Boyce Tr. 102:13-103:7 ("Q: You were hoping that if you could get in front of Bruce Weber, that the heavens were going to open, something was going to happen, that was going to put you on the radar? A. Yes, I

thought he had that type of power. Q. What made you think that you had that type of look after being rejected for four years that anything would change if Bruce Weber took your picture? A. I believed in myself.") (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed as to the testimony. Boyce did not believe "the heavens would open" but hoped Weber was going to put him "on the radar."

V.    **Between 2010 and the December 2014 Portrait Session, Plaintiff and his Agents Relentlessly Pursued Weber and Made Multiple Unsuccessful Attempts to Entice Weber to Photograph Plaintiff**

23.    Plaintiff admitted that his agents contacted Weber many times, all at Plaintiff's request. Boyce Tr. 93:24-94:18 ("Q. But you specifically asked David Todd to contact Bruce Weber on a number of occasions; right? We're going to go over them later, but -- A. Yes, yes. Q. Suffice it to say, there were many times, at your request, Bruce Weber's name comes up, specifically, and you want to get in front of him? A. Correct.") (Brown Decl., Ex. A).

**Plaintiff's Response**: Disputed. Boyce did not say that "all" of the requests from his agents to Weber were at his request. (Boyce Tr. 93:24-94:18, Fudali Decl., Ex. D) (responding affirmatively to "on a number of occasions" and "many times"). Todd told Boyce that he was close with Weber and that Boyce would be "perfect" for Weber. (*Id.* at 101:21-102:1.) Boyce testified that it was both his and Todd's idea to shoot with Weber. (*Id.* at 102:2-9.) Additionally, part of the application process is an agent sending photos of their models to Defendants to solicit work. (*See* Fudali Decl., Exs. BBB, CCC, DDD, EEE).

24.    Starting as early as 2010, Plaintiff met with Todd to discuss his pursuit of Weber and his desire for Weber to shoot him. Boyce Tr. 100:23-102:12 (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.  For clarification, Boyce's meeting with Todd was not to discuss Boyce's "pursuit" of Weber, but rather the opportunity to shoot with him.  In 2010, Todd told Boyce that Todd was close with Weber and that Boyce would be "perfect" for Weber. (Boyce Tr. 101:21-102:1, Fudali Decl., Ex. D.)  Boyce testified that it was both his and Todd's idea to shoot with Weber. (*Id.* at 102:2-9.)

25.     On August 26, 2010, Plaintiff emailed Todd and asked whether he would have the chance to meet with Weber. ("Yo do you think I will get a chance to meet Bruce Weber?") (Brown Decl., Ex. F).

**Plaintiff's Response:** Undisputed.

26.     On April 18, 2011, Plaintiff emailed Todd, "Hey can I go see with Bruce Weber? Is he in NY right now?" (Brown Decl., Ex. G). Todd told Plaintiff he would set it up. *Id.*

**Plaintiff's Response:** Undisputed.

27.     On April 19, 2011, Plaintiff emailed Todd, "[C]an I call you about Bruce Weber?" (Brown Decl., Ex. H).

**Plaintiff's Response:** Undisputed.

28.     The same day, Todd emailed Weber a photo of Plaintiff. (Brown Decl., Ex. I).

**Plaintiff's Response:** Undisputed.

29.     On April 20, 2011, Todd emailed Weber several more pictures of Plaintiff, stating, "You will LOVE this kid Bruce." (Brown Decl., Ex. J).

**Plaintiff's Response:** Undisputed.

30.     On April 20, 2011, Plaintiff went to Little Bear for a "go-see." (Brown Decl., Ex. K).

**Plaintiff's Response:** Undisputed.

31.     Weber was not present for the "go-see." Boyce Tr. 106:12-14; 107:21-108:12. (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.

32.     After seeing Plaintiff, Weber's assistant emailed Weber about Plaintiff. (Brown Decl., Ex. L) ("Bruce, saw this guy today-sweet guy-but has a very 'boxy' face.").

**Plaintiff's Response**: Undisputed.

33.     Weber never responded or commented on this email chain. (Brown Decl., Ex. L).

**Plaintiff's Response**: Undisputed.

34.     Neither Weber nor Little Bear expressed any interest in Plaintiff after the "go-see," and Plaintiff admitted he was disappointed by that. Boyce Tr. at 108:9-109:13 ("A. That is April 20th, 2011. Q. Okay. And that's pretty typical of a go-see, you take quick pictures. You're in and out; right? A. Correct. Q. Okay. Nothing came from that; right? A. Nothing came from that. Q.

Were you disappointed? A. Probably. . . . Q. Okay. But [Little Bear] didn't -- but nobody ever reached out to you, so, obviously, [your agents] weren't right about that, were they? A. Apparently.") (Brown Decl., Ex. A).

**Plaintiff's Response**: Disputed. Weber expressed an interest in Boyce after the "go-see" through subsequent texts and emails with Boyce's agents. (*See e.g.,* Plaintiff's Response to Defendants' Facts 35, 37, 42, 51.) Additionally, Plaintiff stated he was "probably" disappointed but did not have a memory of the alleged "go-see" in 2011. (Boyce Tr. 106:12-109:1, Fudali Decl., Ex. D.)

## VI.    Plaintiff's Pursuit of Weber Intensified and Continued After Plaintiff was Rejected at the Go-See

35.    On March 1, 2013, Todd texted Weber, unprompted, "Its David! Can I send you a super-hot boys pic [Plaintiff] took for me to send you for your eyes only?" Todd then texted, "This is Jason Boyce 24 and 6 feet. Stunning!!!" Todd included a nude "selfie" photograph of Plaintiff. (Brown Decl., Ex. M).[1]

**Plaintiff's Response**:  Disputed only as to "unprompted."  Agents frequently pitched models to Weber and Weber regularly booked "go-see" with models through their agents by text message.  For example, Todd texted photos of a model named Bobby to Weber in March 2015, without an invitation from Weber, and Weber responded, "He looks good when is he here in Miami… Is he shy what's his personality like?  Maybe I can see him quickly on this Fri… let him come by my place on Golden Beach at 11 in the morning… He should bring a pair of shorts and a t shirt with him- how long is he staying[?]"  (Fudali Decl., Ex. DD); (*see also* Fudali Decl., Ex.

---

[1] Defendants' Footnote: This and other nude photos included with the motion are redacted out of respect for the Court and at the request of Plaintiff's counsel.

AA, Response Interrogatory No. 13) (Kanner "tried to 'pitch' as many models as possible to Bruce Weber[.]").

36.     David Todd testified that Plaintiff had supplied the nude "selfie" to Todd so that Todd could send it to Weber, and that it was Plaintiff's idea to send a nude "selfie". Todd Tr. 87:25-88:17 (Brown Decl., Ex. C).

**Plaintiff's Response**: Undisputed.  For clarification, other models have also told Todd to forward Weber their naked photos. (Todd Tr. 212:13-23, Fudali Decl., Ex. C.)

37.     Weber responded to Todd the same way he responds to all agents with whom he regularly worked—politely, with compliments and generic questions. Weber Tr. 135:19-140:8. (Brown Decl., Ex. B).

**Plaintiff's Response:**  Disputed.  After Todd texted Weber the photograph of Boyce with his genitals exposed, Weber's response was neither polite nor generic.  Contrary to the times Todd texted Weber a photo of Boyce which did not expose his genitals, this time, Weber became insistent on meeting Boyce.  Weber responded to Todd three minutes after receiving Boyce's nude photo, "Where is he from and when can I see him?"  After Todd responded, Weber asked Todd again that evening on March 1, 2013, "When can I see him? What is the personality[?]"  The next day, on March 2, 2013, Weber texted Todd, "Is JAson in town and how long[?]"  (Exhibit M, Brown.) When Todd fails to respond, less than ten minutes later, Weber texts Todd again, "??????0" (Exhibit M, Brown.)  These responses were not polite, nor "the way he responds to all agents."

38.     On March 2, 2013, Todd texted Weber and asked if Weber could see Plaintiff the next day. (Brown Decl., Ex. M).

**Plaintiff's Response:**  Disputed.  This is a misleading characterization of the text exchange on March 2, 2013.  The texts on March 2, 2013 between Todd and Weber began with Weber initiating the conversation about Boyce at 4:39 P.M. asking, "Is Jason in town and how long[?]" After Todd fails to promptly respond, Weber texted Todd again at 4:47 PM, "??????0" Todd then replied at 5:04 p.m. and stated that Boyce was shooting that day, but asked if Weber could see him the next day.  (Exhibit M, Brown Decl.)

39.     On March 4, 2013, Todd texted Weber four more times to ask whether Weber was in town and to state that Plaintiff would love to meet him. (Brown Decl., Ex. M).

**Plaintiff's Response**:  Disputed.  This is a misleading characterization of the text exchange between Todd and Weber about Boyce.  Todd did not text Bruce about meeting Boyce unprompted on March 4, 2013.  After Todd sent Weber the photograph of Boyce with his genitals exposed, Weber texted Todd four times about meeting Boyce from March 1, 2013 to March 2, 2013. ("When is he from and when can I see him?" "When can I see him? What is the personality[,]" "Is JAson in town and how long[,]" "??????0")  Todd texted Weber twice on March 4, 2013, "Hi Bruce. Are you still in town?" and texted Weber twice "Jason would love to meet you." (Exhibit M, Brown.)

40.     Weber did not reply until 3 days later, on March 7, 2013, when Weber texted Todd, "No I am leaving sorry – but keep in touch and hope to see you soon". (Brown Decl., Ex. M).

**Plaintiff's Response**: Undisputed.

41.     On February 18, 2014, Todd texted Weber, "Jason Boyce 6 feet 24 gorgeous," and again included a nude "selfie" photograph of Plaintiff. (Brown Decl., Ex. N).

**Plaintiff's Response:** Undisputed.


42.     After Todd answered Weber's standard questions about Plaintiff, Weber wrote Todd: "You know I like your guys - - I'm on a crazy scheduled well that's all I can say now." (Brown Decl., Ex. N).

**Plaintiff's Response:**  Disputed.  This is a misleading characterization of the text messages between Todd and Weber.  After Todd sent Weber a photo in which Boyce's genitals were exposed, Weber once again showed interested in Boyce.  Weber responded that evening, "Very handsome!" "What's the personality like?" "Where is he from[,]" "Where does he live now?" (Brown, Ex. N)


43.     Todd testified that he sent the text messages and nude photos to Weber at Plaintiff's direction. Todd Tr. 87:25-88:17. (Brown Decl., Ex. C).

**Plaintiff's Response**: Undisputed.


44.     Todd testified that he could not think of any other photographer, besides Weber, to whom Plaintiff suggested they send nudes. Todd Tr., 168:15-21 ("Q. May 19th, the spring of 2014, Jason Boyce writes to you, DT 946. 'If I take a naked one, maybe send it to Bruce Weber or somebody.' Do you remember that? A. Yes. Q. It seems like -- did he write that about anybody else, any other photographers? A. Not that I can think of.") (Brown Decl., Ex. C).

**Plaintiff's Response**:  Undisputed. For clarification, other models have also told Todd to forward Weber their naked photos. (Todd Tr. 212:13-23, Fudali Decl., Ex. C.)

45.     On June 2, 2014, Kanner sent several pictures of Plaintiff to Weber. (Brown Decl., Ex. O).

**Plaintiff's Response**: Undisputed.

46.     In or about November 2014, Plaintiff was photographed by Joe Lally for Plaintiff's book. Boyce Tr. 128:20-129:20. Plaintiff asked Lally if he knew Bruce Weber and asked if he would send Weber the photos he was taking for Plaintiff's book. *Id.* (Brown Decl., Ex. A).

**Plaintiff's Response**:  Disputed. Lally mentioned during Boyce's photoshoot that he was close with Weber and that Boyce had a great look for Weber.  (Boyce Tr. 128:20-129:20, Fudali Decl., Ex. D.) Boyce asked Lally if he would send his photos to Weber because Lally had brought up their close relationship.  (*See id.*)

47.     Plaintiff admitted that he and his agents sent Weber pictures because Plaintiff wanted to get Weber interested in him as a model, but by 2014 nothing had come of it. Boyce Tr. 112:23-113:6. (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.

48.     Plaintiff admitted that he and his agents initiated conversations with Weber about Plaintiff, and that Weber <u>never</u> initiated conversations about Plaintiff. Boyce Tr. 113:7-21. (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed that Plaintiff testified as to this, however agents constantly sent Weber photos of their models as part of the job application process, without an invitation from Weber. (E. Murphy Tr. 53:17-54:8, Fudali Decl., Ex. F.); (Weber receives a "barrage" of texts from agents of model photos); (*see e.g.* Fudali Decl., Ex. DD) (Todd texted photos of another model to Weber and Weber booked him for a "go-see" by text); (*see also* Fudali Decl., Exs. BBB, CCC, DDD, EEE.) (Kanner sent photos to Defendants of a model and Defendants then asked to put the model on hold for a Land's End shoot).

### VII.   Weber Agrees to do a Portrait Session with Plaintiff as a Favor to Kanner, Plaintiff's New York Agent

49.     On November 19, 2014,[2] Kanner again emailed Weber about Plaintiff: "Bruce how are you? . . . I have not been crazy about a guy in a LONG time ... this is the one . . . you have to trust me here . . . I hope you like him." Kanner attached 11 pictures of Plaintiff to the email. (Brown Decl., Ex. P).

**Plaintiff's Response**: Undisputed.


50.     In or about November 2014, Weber worked on a brand campaign for Barney's. Barney's provided a very low budget for model pay. Nevertheless, Kanner, with whom Weber has had a long-standing professional relationship, came through with talented models at the low price, for which Weber was very appreciative and grateful. Weber Tr. 90:24-91:14; 150:1-8. (Brown Decl., Ex. B).

---

[2] Defendants' footnote: Time stamps on emails vary given time zones. For example, some record evidence reflects that this email was sent the evening of November 19, while others reflect just after midnight on November 20.

**Plaintiff's Response**:  Undisputed.  However, low or unpaid work for Weber's shoots was not uncommon, and models were very willing to do so just to get a photo taken by Weber in their portfolio.  (*See* Ricketson 198:10-22, Fudali Decl., Ex. I.)

51.     Thus, on November 21, 2014, Weber responded to Kanner's November 19 email, stating, "[M]aybe I can meet him in NYC when I come back to the city in December . . . thanks for helping us with this Barney's thing". (Brown Decl., Ex. Q).

**Plaintiff's Response**: Disputed.   This is a misleading characterization of the email exchange.  Weber responded to Kanner's email "Hey Jason he is really handsome in an old school way- maybe I can meet him in NYC when I come back to the city in December- or if he is in Miami- where is he from[?]"  (Brown Decl., Ex. Q.)  Weber then added at the end of the email, "thanks for helping us with this Barney's thing[.]" (*Id.*)  Weber's response to the email was primarily praise for Boyce and expressing an interest in meeting him, only mentioning the Barney's job as a throwaway at the end of the email.  There is no indication from the email that Weber intended a potential meeting with Boyce to be some kind of repayment for Kanner assisting him with the Barney's photoshoot.  Kanner did not bring up Barney's in his November 19, 2014 email about Boyce, nor mention anything about how meeting Boyce would be a favor to Kanner or repayment for Kanner assisting Weber with obtaining models for the Barney's shoot.   (*Id.*).

Further, because models were very willing to do unpaid work with Weber, Kanner's securing models for the job would not have been difficult or something for which Weber would have needed to return the favor.  (*See* Ricketson 198:10-22, Fudali Decl., Ex. I) (models are willing to do unpaid work with Weber because it benefits them professionally).

52.     On November 21, 2014, Kanner wrote back to Weber that Plaintiff was incredible, Plaintiff would have been great for Versace, and that Plaintiff would be in New York and available to meet Weber until December 18, 2014. (Brown Decl., Ex. Q).

**Plaintiff's Response**: Undisputed.

VIII.   **Setting Up the Portrait Session**

53.     Kanner called Weber and asked him to take photographs of Boyce as a favor. Weber Tr. 88:8-14 ("Q. What was the circumstance of why you were meeting Mr. Boyce in front of the Tiffany's? A. His agent, Jason Kanner, called me and asked me if I would do him a favor and see him and take his photograph as a favor to him.") (Brown Decl., Ex. B ); Weber Tr. 91:5-14 ("Q. Why were you doing a favor for Jason Kanner? A. Because he's an agent that I have known a long time. But only business-wise, not personally. And I had just done a couple of shootings. One was for Barney's. One was for Versace, where he got me really, really good guys  . . .") (Brown Decl., Ex. B ); Boyce Tr. 146:13-21 (admitting that Kanner arranged with Weber for the portrait session) (Brown Decl., Ex. A).

**Plaintiff's Response**:  Disputed.  The documentary evidence shows that Weber wanted to meet Boyce several times after seeing his photos.  Weber was insistent on meeting Boyce after Todd texted Weber a photo of Boyce on March 1, 2013. (Brown Decl., Ex. M) ("Where is he from and when can I see him?" "When can I see him? What is the personality[,]" "Is JAson in town and how long[,]" "??????0").  After Todd sent Weber a photograph of Boyce on February 18, 2014, Weber also complimented Boyce and asked about him. (Brown Decl., Ex. N) ("Very handsome!" "What's the personality like?" "Where is he from" "Where does he live now?"). When Kanner sent photos of Boyce on November 21, 2014, Weber responded that Boyce was "really handsome

in and old school way" and said he would meet Boyce in New York City or Miami.  (Brown Decl., Ex. Q.)  These emails and texts demonstrate that Weber did not meet Boyce solely as a favor to Kanner, as Weber had expressed interest multiple times in meeting Boyce to potentially photograph.  In his deposition, Weber admitted that he reviewed the photos of Boyce that Kanner sent him before agreeing to meet with Boyce, but added that Boyce "wasn't particularly the kind of guy that I usually photograph."  (Weber Tr. 89:4-20, Fudali Decl., Ex. A.)  Further, Weber invited Boyce to shoot with him during their meeting at the jewelry store.  (*See* Boyce Tr. 361:18-22, Fudali Decl., Ex. D) ("Q: When you met with Bruce Weber at the jewelry story, did he pass on you? A: No. Q: What did he do? A: He set up a photo shoot with me.").

54.    Weber agreed to take some photos of Plaintiff for Plaintiff's modeling book as a favor to Kanner, and *not* for any employment or referral opportunity. Weber Tr. 96:16-97:18. (Brown Decl., Ex. B).

**Plaintiff's Response:**  Disputed.  First, in the cited portion of the transcript, Weber does not testify that he took photos of Boyce as a favor to Kanner.  As established in Plaintiff's Response to Defendants' Facts 51 and 53, Weber had previously expressed an interest in photographing Boyce professionally and there was no indication that the meeting with Boyce was a "favor."

Second, the photoshoot between Boyce and Weber at Little Bear in December 2014, was a "go-see" and thus a job interview.  (*See* Plaintiff's Response to Defendants' Fact 72).

Third, Boyce testified that Kanner explained to Boyce that the meeting at the jewelry store was a "go see." (Boyce Tr. 137:6-138:1, Fudali Decl., Ex. D.) Boyce understood that the subsequent photoshoot with Weber was an interview and the purpose of the shoot was to see if Weber liked him and could use him for future jobs.  (*Id.* at 137:6-138:1, 147:5-16.)

Fourth, Weber had the authority to cancel a one-on-one photoshoot with a model if he wanted.  (Bush Tr. 46:7-12, Fudali Decl., Ex. H.)  Had Weber decided he did not like Boyce's look at the jewelry store meeting, Weber could have cancelled the "go-see" that he claims was set up in advance of their meeting.

55.     On November 24, 2014, Kanner gave Plaintiff Weber's phone number and told him to call him. Boyce Tr. 130:14-17 ("Q. November 24th, when Kanner tells you all this, he tells you -- he gives you Bruce Weber's phone number. And he said Bruce Weber said to call him; right? A. Correct."). (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.

56.     Plaintiff testified that he called Weber that day and they engaged in "unimportant, small talk." Boyce Tr. 143:2-8 ("Q. Tell me what that conversation was. Did you say, hi, Weber, this is Jason Boyce? A. Yes, small talk. Q. Okay. So tell me, to the best of your recollection -- I mean, this was a big deal. You were talking to Bruce Weber finally. What did he tell you? Or you don't remember any of that? A. I mean, I remember it was unimportant, small talk. Q. And that's it? A. Yeah. Q. Then you hang up the phone? A. Yes. Q. Nothing else of any consequence happens then; right? A. Not that I remember.") (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.

57.     After that call, Plaintiff texted Weber another "selfie," said he was working on losing his "love handles," and said he would see Weber soon. (Brown Decl., Ex. R); Boyce Tr., at 130:14-131:8 ("Q. That night, you took a selfie of yourself; right? A. Yes. Q. To send to Bruce

Weber; right? A. Correct. Q. You tell him what a pleasure it was to talk to him, or whatever; right? Do you remember this? A.· That sounds right, yes. Q. And you write, Now I'm going to get to work on my love handles. Do you remember that? A. Yeah.") (Brown Decl., Ex. A).

**Plaintiff's Response**: Undisputed.

58.     Weber did not respond to Plaintiff on this text chain. (Brown Decl., Ex. R).

**Plaintiff's Response**: Undisputed.

59.     On November 27, 2014, Kanner emailed Weber about Plaintiff and another model named Braeden, but Kanner also added that Plaintiff was "incredible" and that Weber "should be shooting" him. (Brown Decl., Ex. S).

**Plaintiff's Response**: Undisputed, however Kanner said that both Braeden and Boyce were "two incredible young man [sic] that you should be shooting." (Brown Decl., Ex. S).

60.     On November 28, 2014, Weber responded by wishing Kanner a happy Thanksgiving and asking about Braeden (but *not* asking about Plaintiff). (Brown Decl., Ex. S).

**Plaintiff's Response**: Undisputed.

61.     Kanner wrote back and brought up Plaintiff again, unprompted, claiming that Plaintiff was "leading the pack" of his models, and he wanted Weber to meet him. (Brown Decl., Ex. S).

**Plaintiff's Response**: Undisputed, however Kanner said that both Braeden and Boyce were "leading the pack."  (Brown Decl., Ex. S).

62.     Weber did not respond to Kanner's November 28 email or show any interest in Plaintiff. (Brown Decl., Ex. S).

**Plaintiff's Response**: Undisputed.

63.     On December 5, 2014, Kanner emailed Weber to remind him about Plaintiff, imploring him to meet with Plaintiff the following week, and attaching 9 pictures of Plaintiff to the email. (Brown Decl., Ex. T) ("Hi Bruce. . . I hope all is well! I wanted to remind you about this boy . . . that you HAVE TO MEET NEXT WEEK!! While you are back… please let me know.").

**Plaintiff's Response**:  Disputed as to "imploring."  As previously established, Weber had expressed interested in meeting Boyce in response to previous email and text communications.

64.     On December 11, 2014, Kanner emailed Weber yet again. (Brown Decl., Ex. U). The subject of the email is "Jason Boyce by Tarrice Love [a photographer]". *Id*.  Kanner attached 6 more pictures of Plaintiff to this email. *Id*.

**Plaintiff's Response**:  Undisputed.

65.     On December 12, 2014, Kanner told Plaintiff to meet Weber at a jewelry store. Boyce Tr. at 131:18-21 ("Q. On December 12th, Jason Kanner calls and tells you to go meet him -- go meet Bruce Weber at Tiffany's; right? A. Yes."); 132:22-23 (Kanner texted him) (Brown Decl., Ex. A).

**Plaintiff's Response**:  Undisputed.

66.     Weber already agreed to photograph Plaintiff prior to seeing Plaintiff at the jewelry store, but Weber wanted to meet Plaintiff before photographing him, as he typically does with portrait subjects. Weber Tr. 92:16-95:12 ("Q. So prior to meeting Mr. Boyce in front of Tiffany's, was there already a scheduled shoot that you were going to do with Mr. Boyce?  A. Well, yes, I told him I would do it. Q. Okay. So let me make sure I understand. So the favor to Mr. Kanner was not necessarily the meeting at Tiffany's. The favor to Mr. Kanner was shooting Mr. Boyce, correct? A. That's right."); (Brown Decl., Ex. B).

**Plaintiff's Response**:  Disputed. Boyce testified that during his meeting with Weber at the jewelry store, Weber told him that he would set up a shoot with him through Kanner. (Boyce Tr. 361:18-22, Fudali Decl., Ex. D.)  Additionally, the cited portion of the transcript is silent as to what Weber's typical practice was as to portrait subjects.

67.     When they met at the store, they introduced themselves, and Weber made suggestions about Plaintiff's "look" for the portrait session, such as not to shave and to bring a black shirt if he had one. Weber Tr. 92:19-93:16. As with their prior phone conversation, the meeting consisted of "small talk" and nothing more. (Brown Decl., Ex. B).

**Plaintiff's Response:**  Disputed.  The meeting was not "small talk" and nothing more. During the meeting, Weber invited Boyce to a photoshoot, and directed Boyce on how to dress and appear for the photoshoot, establishing his interest in Boyce as a model and control over the "go-see."  Weber told Boyce to wear a dark shirt to the photoshoot, told Boyce he had a great look, and instructed Boyce to not shave before his photoshoot.  (Weber Tr. 92:16-93:6, Fudali Decl., Ex. A.); (Boyce Tr. 144:8-145:1, Fudali Decl., Ex. D).

68.     Plaintiff's description of the jewelry store meeting aligns with Weber's description, admitting this conversation, like the first phone conversation, was "mostly small talk".[3] Boyce Tr. 143:24-145:7 ("Q. Okay. After that, the next communication with Bruce Weber is at the jewelry store, Tiffany's, or wherever? A. Yes. Q. Tell me what the conversation was at Tiffany's or whatever. A. Okay. It was -- again, he asked me how long I'd been in New York, he asked me, you know, where I was from, a lot of small talk. . . . A: I wasn't, but... I don't remember exactly. It was probably 15 minutes, 20 minutes, tops. From what I recollect, from what I recall. And, again, you know, he said that I had a great look and --  He said that I had a great look and he wanted me to keep -- I had some stubble at the time. He said, you know, keep that stubble, you know, when I shoot you. Q. What else did he say? A. That's all I remember.").  (Brown Decl., Ex. A).

**Plaintiff's Response:**  Disputed.  (*See* Plaintiff's Response to Defendants' Fact 67).

## IX.     <u>The Portrait Session</u>

---

[3] Defendants' Footnote: Plaintiff admitted that Weber had already agreed to take pictures of him before the jewelry store meeting, and thus there was no discussion at the jewelry store about whether the portrait session would take place. Boyce Tr. 138:17-21. However, in questioning from his own attorney, Plaintiff testified for the first time that when he met Weber at the jewelry store, Weber set up the photoshoot with him. Boyce Tr. 361:18-21. However, it is undisputed the conversation setting up the portrait session was between Kanner and Weber. Plaintiff was not part of the conversation, and thus, he has no firsthand knowledge of it. Whatever he "believed" or thought" is irrelevant and inadmissible hearsay. Moreover, Plaintiff admits that Weber told him not to shave for the portrait session, which also confirms it had already been agreed between Kanner and Weber that Weber was going to photograph Plaintiff. Boyce Tr. 144:24-145:7.

**Plaintiff's Response to Defendants' Footnote**: Disputed. First, the fact that Weber told Boyce to not shave and what to wear during the jewelry store "go-see" does not prove that Weber had previously agreed to a photoshoot.  A "go-see" is like an initial interview with Weber.  (Weber Tr. 75:2-7, Fudali Decl., Ex. A.)  Weber could have decided, during the "go-see" that he liked Boyce's look and wanted to work Boyce and shoot him in the future.  Second, Boyce brought up in his initial examination with Weber's attorney, not for the first time on redirect, that Weber told Boyce during the jewelry store meeting that Weber would set the photoshoot up with Kanner.  (*See* Boyce Tr. 139:7-140:14, Fudali Decl., Ex. D.)  (When questioned about what Weber said at the jewelry store, Boyce responded, "Bruce Weber said that he would set it up [the photoshoot] with Jason [Kanner], and he told me not to shave.")  Third, the fact that Boyce recalls that Weber set the photoshoot up during the jewelry store meeting and Weber recalls the photoshoot being set up before the meeting means that this fact is disputed.  (*See id.* 361:18-22)

69.     On December 15, 2014, Kanner emailed Weber: "I know that Mr. Jason Boyce has been trying to set up a time to see you. I know you're busy and I really appreciate that you'll see him. Let me know if there is anything I can do to help." (Brown Decl., Ex. V).

**Plaintiff's Response:** Undisputed.

70.     The photoshoot and alleged incident occurred shortly thereafter, on December 15 or 16, 2014. Boyce Tr. at 214:2-215:16. (Brown Decl., Ex. A).

**Plaintiff's Response:** Undisputed.

## X.     **The Portrait Session did not Involve any Employment Opportunity**

71.     Weber agreed to take some photos of Plaintiff for Plaintiff's modeling book as a favor to Kanner, and *not* for any employment or referral opportunity. Weber Tr. 96:16-97:18. (Brown Decl., Ex. B).

**Plaintiff's Response:**  Disputed.  Plaintiff refers to his response to Defendants' Fact 54, which is identical to Fact 71.

72.     Plaintiff conceded in his deposition that the portrait session with Weber "was not for a specific job." Boyce Tr. 148:1-12. (Brown Decl., Ex. A).

**Plaintiff's Response:**  Disputed.  Plaintiff did not refer to the photoshoot with Weber as a "portrait session" but characterized it as an interview with Weber or test shoot.  (Boyce Tr. 147:5-16, Fudali Decl., Ex. D.)  The purpose of the shoot was to see if Weber liked Boyce and could use him for future jobs.  (*See id.* at 147:5-148:5.)

29

The December 2014 photoshoot between Boyce and Weber was a "go-see," and not a "portrait session." Defendants even admit that the December 2014 meeting at Little Bear was a "go-see" in their Amended Responses to Plaintiff's First Set of Interrogatories. (*See* Fudali Decl., Ex. Y, Response to Interrogatory No. 1) (listing Jeanine Morick, Jeffrey Tautrim, Natalia Ortega, and Nathaniel Kilcer as witnesses with relevant information all being "present at the location of the go-see.").

The only reason a model would go to the Little Bear studios is for a "go-see," casting, or a photoshoot for a campaign on Little Bear's premises. (E. Murphy Tr. 34:7-35:11, Fudali Decl., Ex. F.) There has been no evidence in this case that Boyce was at Little Bear for a campaign shoot, so Boyce must have been at Little Bear for a casting or "go-see."

The December 2014 "go-see" at Little Bear could not have been a "portrait session" because "portrait sessions are where clients commission and pay Weber to take their portrait." (*Id.* at 34:24-35:7). Boyce did not commission or pay for the photos Weber took of him during the shoot. (Bernstein Tr. 73:19-74:3, Fudali Decl., Ex. E) ("Q: And who paid for the prints [referring to the prints of Boyce]? A: Little Bear paid for the prints. Q: And who paid for the messengering of the contact sheet and the prints? A: Little Bear. Q: Did anyone pay Mr. Weber for his time? A: No."). Additionally, Weber has never conducted a "portrait session" at Little Bear. (E. Murphy Tr. 34:24-35:7, Fudali Decl., Ex. F.) Weber would rent out a space for a "portrait session" rather than have it at the Little Bear studios. (Bush Tr. 22:7-25, Fudali Decl., Ex. H.)

Therefore, the December 2014 photoshoot was a "go-see." Little Bear established that a "go-see" is synonymous with a casting. (E. Murphy Tr. 30:21-32:20, Fudali Decl., Ex. F) ("A go-see generally means a casting"). Weber explained that a casting is like a job interview, thus the December 2014 "go-see" with Boyce at Little Bear was a job interview. (Weber Tr. 174:9-14,

Fudali Decl., Ex. A) ("Q: Who decides who is invited to the casting? A: You make it sound like a party.  There's not an invitation.  *It's like a job interview* and you get the job and you either got it or you don't, you know.") (emphasis added).

**XI.**   **Plaintiff Praised Weber after the Favor Portrait Session and Continued to Press his Agents to Contact Weber for Him**

73.   On December 16, 2014, Plaintiff texted his California agent, Todd, "Just met and shot with Bruce Webber! . . . Such a nice guy. So encouraging. Will you ask him what he thought of me??? . . . I know if you ask him, you'll get the real story :-)". (Brown Decl., Ex. W). Plaintiff added, "I'm getting more and more self-confidence. I know it's a problem area for me. Hearing no for so many years. But with you in my corner, and jay [Kanner]. And hopefully Bruce [Weber]. I can't help but be confident." *Id*.

**Plaintiff's Response:** Undisputed.

74.   Plaintiff admitted these texts with Todd occurred and that they happened the day after the photoshoot with Weber. Boyce Tr. at 214:2-215:16. (Brown Decl., Ex. A).

**Plaintiff's Response:** Undisputed.

75.   On December 16, 2014, Kanner emailed Weber, stating "Thank you for seeing" Plaintiff. (Brown Decl., Ex. X).

**Plaintiff's Response:** Undisputed.  However, Kanner also thanked Weber for seeing a model named Braeden, and askes for feedback on both models. (Brown Decl., Ex. X).

**XII.**   **Plaintiff's Pursuit of Weber Continued Long After the Favor Portrait Session – Through 2015 and 2016**

76.     On March 14, 2015, Plaintiff texted Weber, unprompted, "Hi Bruce!! I hope you
are doing well. This is Jason Boyce. I just wanted to say hello! :-)". (Brown Decl., Ex. Y).

**Plaintiff's Response**:  Disputed as to "unprompted."


77.     Weber responded by asking whether Plaintiff received his photographs from their
photoshoot. (Brown Decl., Ex. Y). Plaintiff stated that he would check with his agency and hoped
he would see Weber in April 2015 when he returned to New York. *Id.  Weber did not respond. Id.*

**Plaintiff's Response**: Undisputed.


78.     On April 27, 2015, Plaintiff texted Weber, again, unprompted, "Happy Monday
Bruce! I hope you are well :-)". Plaintiff attached a picture of himself posing shirtless. Weber
responded <u>three days later</u>, "Good to hear from you." (Brown Decl., Ex. Z).

**Plaintiff's Response:** Undisputed.


79.     On May 16, 2015, Plaintiff texted Weber, "Hope you're having a good weekend
Bruce!! :-)". Plaintiff included a picture of himself posing shirtless and accentuating his groin.
(Brown Decl., Ex. AA).

**Plaintiff's Response:**  Disputed.  The cited photo was not zoomed in on or otherwise
"accentuating his groin."  (*See* Brown Decl., Ex. AA).


80.     On May 29, 2015, Plaintiff again texted Weber a picture of himself shirtless and
with much of his upper groin area exposed, suggesting he was naked, and wrote, "Would love to
FaceTime and catch up soon! :-) . . . I come back Sunday night. I'm here next Monday, and

Tuesday, then on wed I leave for LA for the month of June. Then back to NY on July 8th." (Brown Decl., Ex. AA).

**Plaintiff's Response:** Disputed.  The cited photo was not "suggesting he was naked"; in fact, in the lower right hand corner of the photo, you can see that Boyce is not naked.  (Brown Decl., Ex. AA).

81.     Weber responded: "Ok well give me a call anytime and if it's good I can talk- happy for you things are working out and you look great!" (Brown Decl., Ex. AA).

**Plaintiff's Response:**  Disputed.  This is a mischaracterization of the text exchange between Weber and Boyce and omits Weber's sudden piqued interest in Boyce.  After Boyce sent the shirtless photo of himself on May 29, 2015, Weber responded, "You look super – *what's up this weekend* ??" (emphasis added.)  Boyce replied that he was going to the Hamptons in New York to shoot for South African GQ.  Weber responded, "You will fucking turn some heads[.]" Boyce texted Weber that he would like to catch up soon, to which Weber replied, "I dig that" and then asked Boyce "When are you around[?]" After Boyce told Weber his schedule, Weber responded, "give me a call anytime and if it's good I can talk- happy for you things are working out and you look great!" (Brown Decl., Ex. AA).

82.     On April 10, 2016, Kanner emailed Weber about Plaintiff and attached 6 pictures of Plaintiff. (Brown Decl., Ex. BB) ("hi Bruce. do you remember the gorgeous jason boyce?").

**Plaintiff's Response:** Undisputed.

83.     On April 10, 2016, Weber respond to Kanner that Plaintiff was "handsome" and that he was looking forward to meeting one of Kanner's other models named Dan. (Brown Decl., Ex. CC).

**Plaintiff's Response:**  Disputed. Weber's responded to the email that Boyce was "still so handsome" contradicting Weber's deposition testimony that Boyce was not his type, and he only shot Boyce as a "favor" to Kanner.  (Brown Decl., Ex. BB; *see also* Plaintiff's Response to Defendants' Facts 51, 53-54.)


84.     Weber then wrote a follow up response on April 10, 2016, that the model named Dan should call him. (Brown Decl., Ex. DD).

**Plaintiff's Response:** Undisputed.


Dated: New York, New York
March 12, 2020                                     **THE BLOOM FIRM**


                                          By:     /s/ Arick Fudali
                                                  Arick Fudali
                                                  Anna Levine-Gronningsater
                                                  Sarah Bloom
                                                  85 Delancey St. #29
                                                  New York, NY 10002
                                                  E-mail: arick@thebloomfirm.com
                                                  Telephone: (954) 661-6734
                                                  Facsimile: (866) 852-5666
                                                  *Attorneys for Plaintiff Jason Boyce*