UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JASON BOYCE,

        Plaintiff,

    v.

BRUCE WEBER and LITTLE BEAR, INC.

        Defendants

Case No.  1:19-cv-03825-JMF

**PLAINTIFF'S COUNTERSTATEMENT OF FACTS IN RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT**

Pursuant to Rule 56.1 of the Court's Local Civil Rules, Plaintiff Jason Boyce ("Boyce" or "Plaintiff") by and through the undersigned counsel, submits the following Counterstatement to Defendants Bruce Weber and Little Bear, Inc.'s Rule 56.1 Statement of Material Facts.

## DEFINITIONS AND CITATION FORMAT

This Rule 56.1 Counterstatement adopts and incorporates the definitions and abbreviations used in Plaintiff's Opposition to Defendants' Motion for Summary Judgment.  Plaintiff uses the following citation forms:

## PLAINTIFF'S COUNTERSTATEMENT OF FACTS

### I.      DEFENDANTS' CONTROL OVER MODELS' CAREERS

### A.  WEBER'S PROMINENT STATUS IN THE MODELING INDUSTRY

1.      Bruce Weber ("Weber") is one of the most influential photographers in the world. (*See* Fudali Decl., Ex. B, hereinafter, "Bruce Weber Vimeo Biography") ("Bruce Weber, born in rural Greensburg, Pennsylvania in 1946, became the preeminent photographer of the fashion industry in the 1980s and continues to be one of the world's most popular and influential

1

photographers."); (Weber Tr. 307:17-308:11, Fudali Decl., Exh. A) (referring to the Bruce Weber Vimeo Biography, "Q: Did you approve this bio? A: Yes, I did. . . Q: It seems – there is nothing untrue in that bio? A: Not that I can say.").

2.      Weber has photographed campaigns for brands like Calvin Klein, Versace, Ralph Lauren, and Abercrombie & Fitch. (*See* Bruce Weber Vimeo Biography, Fudali Decl., Exh. B.) He is one of the most well-regarded photographers in the fashion industry. (Todd Tr. 69:10-14, Fudali Decl., Exh. C) ("Q: So let's talk about Bruce Weber, for example.  He's a big photographer? A: Yes.  Q: One of the best in the world? A: Yes.")

3.      Weber has the power to make a male model's career. (Todd Tr. 70:12-73:4, Fudali Decl., Exh. C) ("Q: Can you give me any specific example of any shoot that you're aware of that Bruce Weber recommended somebody, and – and it happened or didn't happen? A: I'd have to think about it, but, absolutely.  I mean, there's been many of – he's started the careers of so many male models… I think there's been both cases that I can recall in which he had – had the power to get the model hired."); (Boyce Tr. 100:6-9, Fudali Decl., D) ("Q: What do you remember about Bruce Weber, why you wanted to get in front of him? A: I knew that he made the careers of a lot of successful male models.")

4.      Having a photograph taken by Weber in a model's portfolio or book is a thing of value and can enhance a model's career. (Todd Tr. 213:14-24, Fudali Decl., Exh. C) ("Q: Does a photo shoot with Mr. Weber offer advantage to a model? A: Yes. Q: How would it advantage Mr. Boyce? A: Just to have [Weber's] photos, and to – to be able to use his name, or post pictures on your Instagram, adding Bruce Weber, it just makes the model look more expensive, let's say, or sought after.")  Models are even willing to do unpaid photoshoots with Weber because a photo from Weber benefits them professionally. (*See* Ricketson Tr. 198:10-22, Fudali Decl., Exh. I.)

5.     The mere opportunity to meet with or be photographed by Weber is an important career opportunity for an aspiring model. (Todd Tr. 214:17-19, Fudali Decl., Exh. C); (*see also* Fudali Decl., Exh. AA, Jason Kanner ("Kanner") Response to Plaintiff's Interrogatory No. 26) ("[Kanner's] opinion is that a photoshoot with an influential photographer such as Mr. Weber, would have been an important opportunity for Plaintiff.")

## B.  WEBER'S CONTROL OF CASTINGS AND SELECTION FOR CAMPAIGNS

### i.  Test Shoots, Go-Sees, and Portrait Sessions at Little Bear

6.     Models can be booked for a campaign by going to meet with a photographer, like Weber, who has influence over the selection of models for a campaign shoot.  (Todd Tr. 66:16-67:10, Fudali Decl., Exh. C) ("A photographer, if it's –a known photographer that has influence on the model casting, then that can be a little bit different… if it's a big photographer, he can go to the production team and say I want this model.")

7.     There are different terms for meetings and photoshoots used by Weber and Defendant Little Bear Inc. ("Little Bear"), sometimes interchangeably. (E. Murphy Tr. 30:21-32:20, 34:19-20, 51:22-52:11, Fudali Decl., Exh. F.)

8.     A "go-see" is a casting or job interview with only one model present.  (Todd Tr. 47:3-11, Fudali Decl., Exh. C); (E. Murphy Tr. 30:21-32:20, 51:22-52:11, Fudali Decl., Exh. F.) ("A go-see generally means a casting.")

9.     A "test shoot" is the same thing as a go-see. (E. Murphy Tr. 34:19-20, Fudali Decl., Exh. F) ("Q: What about a test shoot? A: That's a go see to me.")

10.     A test shoot or go-see can lead to a model getting hired for a specific job. (*See* Pl.'s Counter Fact 37.)

11.     A "portrait session" is a photoshoot in which the photographer shoots portraits of the subject. (E. Murphy Tr. 34:24-7, Fudali Decl., Exh. F.) Subjects pay Weber for portraits. (*Id.*) Weber has never conducted a portrait session at Little Bear. (E. Murphy Tr. 34:24-7, Fudali Decl., Exh. F) ("Q: What about a portrait session? A: Like a commissioned portrait session? I mean, if Bruce – I have never seen one happen there.")

12.     A casting is a job interview. (Weber Tr. 174:9-14, Fudali Decl., Exh. A) ("Q: Who decides who is invited to the casting? A: You make it sound like a party.  There's not an invitation. *It's like a job interview* and you get the job and you either got it or you don't, you know.") (emphasis added). As a "go-see" is synonymous with a casting, (E. Murphy Tr. 30:2-32:20, Fudali Decl., Exh. F) a "go-see" is also a job interview.

13.     The only reason a model would go to Little Bear is for a go-see, casting, or a campaign photoshoot occurring on Little Bear's premises.  (*Id.* at 34:7-35:11.)

### ii.  Defendants' Role in Castings

14.     A "client" is the company which hires and pays Defendants for Weber's photography services. (*See* Bernstein Tr. 115:17-18, Fudali Decl., Exh. E.) (Vogue and Conde Nast are "clients") An "editorial" is a photoshoot for magazine or publication.  (*Id.* at 115:1-5.)  A "campaign" is a photoshoot for a specific brand, such as Abercrombie & Fitch. (Bernstein Tr. 131:2-7, Fudali Decl., Exh. E; E. Murphy Tr. 74:15-18, Fudali Decl., Exh. F.)

15.     Defendants are responsible for the casting process to select models for campaigns and editorials. (Ricketson Tr. 169:15-170:3, 183:25-184:8, Fudali Decl., Exh. I) ("Q: To your knowledge, was Bruce Weber responsible for hiring models to work on projects? A: Yes.  To your knowledge, who cast you to work on the VMan photoshoot? A: Bruce Weber. . . Q: Who cast you to work as a model for Abercrombie & Fitch? A: Bruce Weber.")

16.     Some clients request a list from Defendants for models that would be good for their particular campaign. (E. Murphy Tr. 53:4-16, Fudali Decl., Exh. F.) Defendants then send modeling agencies a list of models whom Defendants want to invite to the casting for said campaign. (Weber Tr. 176:7-17, Fudali Decl., Exh. A.) Castings are not open to the public or publicly posted. (*Id.* at 174:15-18) ("Q: My question is, can any model in New York City just show up to this [Abercrombie & Fitch] casting? A: No.")

17.     Weber would and could suggest certain models for castings. (E. Murphy Tr. 53:17-54:8, Fudali Decl., Exh. F.); (Weber Tr. 177:4-178:5, Fudali Decl., Exh. A) ("Q: Are there occasions when you would create a list of the models that you thought would be good for a certain shoot to send to the agency to send those models to the casting? A: Well, during the month or so when we were starting to work on the preproduction of the job, I might say let's use some of these people that we've used before. . . Q:[A]re there occasions when you would suggest that certain models that you thought might have a good look be invited to the casting? A: I might suggest it, yeah.") If Weber liked a specific model for a campaign, he sent the model's information to Little Bear's casting department to include in the casting. (E. Murphy Tr. 53:17-54:8, Fudali Decl., Exh. F.)

18.     Defendants also held general castings solely for Weber and not for a specific job. (Fudali Decl., Exh. BB) ("[W]e are having a casting for Bruce this Thursday and Friday, Sept 4th and 5th… This is for no job in particular- just a casting to see who is in town.  It will be held at 205 Hudson St- 10th floor- LITTLE BEAR STUDIOS[.]"); (Fudali Decl., Exh. CC) ("We are having a casting just for Bruce this Thursday and Friday to see all the peeps that are in town- what guys do u have that we should see that can come Thursday or Friday btwn 10-4?")  The purpose

of general castings is for Defendants to be prepared with models when clients ask for a list. (E. Murphy Tr. 51:22-52:11, Fudali Decl., Exh. F.)

19.     After castings, Defendants would sort through the applicants and discuss who they wanted to hire for the job. (*Id*. at 56:18-57:22.) Usually, Little Bear's casting department (Weber's "casting girls," Weber Tr. 209:18-210:3, Fudali Decl., Exh. A.) would sort through the applicants first and then send the applicants' photographs to Weber. (E. Murphy Tr. 59:20-60:4, Fudali Decl., Exh. F.); (Tomassone Tr. 20:22-22:9, Fudali Decl., Exh. S.)

20.     Weber would then go through the applicants' photographs before sending them to the client. (E. Murphy Tr. 59:20-60:4, Fudali Decl., Exh. F); (Tomassone Tr. 22:15-23, Fudali Decl., Exh. S.) Weber had the authority to add models to the selection and remove models from the selection before sending to the client. (*See* Tomassone Tr. 23:5-20, Fudali Decl., Exh. S.) Weber had the authority to override his casting director's decision to include a model in the selection, even if she disagreed with his decision. (*Id.* at 97:25-98:22) The client would then choose which models to use for their campaign from the selection of models that Little Bear cultivated and Bruce edited. (*Id.* at 23:1-4).

### iii.  Defendants' Informal Application Process

#### a.  *Getting Weber's Attention*

21.     Weber would receive a "barrage" of text messages and emails from agents about their models, and Weber would respond by inviting models to castings. (E. Murphy Tr. 53:17-54:8, Fudali Decl., Exh. F) ("Q: can Mr. Weber ask for specific people to show up for [castings]? A: The castings, he might.  I mean, just because of the barrage of – I mean, I can't stand the fact that he has a cell phone.  You know he gets barrages from these agents directly.")

22.     When agents sent Weber photographs of their models, Weber would often agree to meet with them; for example, Todd texted photographs of a model named Bobby to Weber in March 2015, and Weber responded, "He looks good when is he here in Miami… Is he shy what's his personality like?  Maybe I can see him quickly on this Fri… let him come by my place on Golden Beach at 11 in the morning… He should bring a pair of shorts and a t shirt with him- how long is he staying[?]" (*See* Fudali Decl., Exh. DD.). In another example, one of Boyce's agents, Jason Kanner, emailed Weber photographs of Plaintiff and Weber responded that perhaps he could meet Plaintiff. (Brown Decl., Ex. Q)

23.     Some of the photographs agents would send to Weber were full-frontal nudes, and occasionally Weber would express interest in those models. (*See* Fudali Decl., Exhs. EE, FF, GG, HH, II.) Agents such as Todd sent nude photos to Weber because nudes showed the model's confidence, and he believed the nude photos were more likely to get an immediate response from Weber than a clothed photo. (*See* Todd Tr. 208:15-19, Fudali Decl., Exh. C.) ("Q: So let's just focus on those two text pictures.  Why did you think sending those would help Mr. Boyce? A: Because it showed his confidence, and it showed that he looked fantastic, and I thought that Mr. Weber would react to those right away, and want to meet him.") Sending a nude picture to a photographer showcases a model's confidence and demonstrates the model is not "shy," which clients value. (*Id*. at 101:7-101:5)("Q: Why is confidence important that the model has? A: Well, I think it's important for the client, when they're onset, to make sure that they're going to carry out whatever the shoot has… [i]f they're going to be wearing underwear, they need to look good in the underwear, and be confident in them, and not look, you know, timid, or shy, or… it's, basically, represent themselves in a professional way… Q: If you're nervous, you're not confident?

A: Right. And everyone can – clients can sense that.  They don't want to work with a model that's shy.")

24.     Weber would often ask agents if their models would consider being photographed nude. (Fudali Decl., Exh. JJ) ("[h]e is so handsome but needs to be nude."); (*see also* Fudali Decl., Exh. KK) ("[h]e is so beautiful ! Can he do a nude?")

25.     Weber also expected models to communicate with him directly.  (*See* Fudali Decl., Exh. DD) ("I ordered some prints of your photos/ I send you a big hug- take a photo if yourself let's see how you are looking these days/ Are you coming to NYC this June or July/???"///"Where the fuck are you Bobby?")

26.     Weber also liked to speak to models on the phone. (Fudali Decl., Exh. LL) ("You can call me as I'll be traveling on the road with my six dogs"); (*see also* Fudali Decl., Exh. MM) (Little Bear emailing Kanner, "I need his phone number as Bruce may want to chat w him"); (Fudali Decl., Exh. NN) (emailing Van Oijen "call me on Skype this weekend sometime").

### b. *Weber Held Himself Out as Having Control Over Jobs*

27.     In May 2009, Weber wrote to model Anthony Baldwin ("Baldwin") that he was "about to do a whole issue of German Vogue" but added that he thought Baldwin was "too conservative" for it. (Fudali Decl., Exh. OO.) Weber emailed Baldwin again the same day, "As for the German Vogue, I think you'll be too worried or if you are not in good enough shape or if your cock is going to show, so I'll try and think of something more normal."  (Fudali Decl., Exh. LL.) After Baldwin sent some photographs of himself to Weber, at Weber's request, Weber told Baldwin "Keep thinking about girls or sports -something that gives you great pleasure. For instance what do you think a girl would think of you right now by the way you look… Let's try and get this

German Vogue job together and don't worry you'll be in the part with some clothes on." (Fudali Decl., Exh. PP.)

28.     On January 5, 2017, Weber emailed Kanner about one of Kanner's models named Luke, writing "I think he's [sic] alittle shy about his body – but I might be able to put him in my cowboy story for Holiday. . ." then referencing an event he had coming up added, "I would like to take Luke as my date – but I don't think he'd like to go." (Fudali Decl., Exh. QQ).

29.     On May 15, 2017, Weber emailed Kanner asking if one of Kanner's models could do Versace.  (Fudali Decl., Exh. RR.) ("Hi Jason could Ethan do Versace? Really strong things with a girl? I know he's shy… Noel [is] such a great personality- If I ok him for V I would have to use him for nothing too crazy[.]")

30.     On May 11, 2011, Weber emailed Kanner, "[t]his new girl is so beautiful -I want to use her for Spanish Vogue." (Fudali Decl., Exh. SS.).

31.     On August 15, 2011, Weber emailed Kanner, "thanks for the pictures of Patrick-he is still one of my favorites and I want to do something on him-I think he will be too shy to be nude for Spanish Vogue-but I will think of something else-maybe a whole story on him-I have to just figure it out[.]" (Fudali Decl., Exh. TT)

32.     On March 3, 2017, Weber emailed Kanner that he liked one of Kanner's models "for [t]he new list for Versace." (Fudali Decl., Exh. UU.)

33.     Weber emailed Kanner, "Hi Jason I saw Matt a great character – good for photos and a good sense of humour- I'll try to think of something for him?" (Fudali Decl., Exh. VV.)

34.     Little Bear emailed Kanner, "Bruce is interested in the guy you rep who is a martial artist.  What's his name? He wants to have our client get in touch with you directly to be part of the cast for an upcoming commercial Bruce is doing[.]" (Fudali Decl., Exh. WW.) Little Bear

frequently contacted agents by email and said that Weber specifically wanted to use one of their models for a campaign or editorial. (*See* Fudali Decl., Exh. XX) ("Bruce is VERY CLEAR THAT HE WANTS BRADEN AND MATT ON HOLD FOR AF!!!! Please keep these options!!! The dates are June 17th-June 24th. We will know def next week- BUT I KNOW BW WANTS THEM!!!!"); (Fudali Decl., Exh. MM) ("Bruce is wondering about that guy Philip from Slovakia. . . Bruce is thinking about him for Versace at the end of this month."; (Fudali Decl., Exh. YY) (requesting to put two of Kanner's models on hold for a "Holiday Mag" shoot in Miami).

35.     The models chosen by Weber were often booked for jobs. For example, Little Bear told Kanner that Weber wanted one of his models, Harry, to do voice-over work for a Polo commercial. Harry ended up getting the job, and billed Little Bear for his services. (Fudali Decl., Exhs. ZZZ, AAAA.) In another example, Little Bear asked Kanner to put three of his models on hold for job, including a model named Rudi, who ended up booking the job. (Fudali Decl., Exhs. ZZ, AAA.)

> c.   *Models Who Got Weber's Attention Were Booked for Jobs*

36.     When agents sent Defendants photographs of models, the models would occasionally be placed "on hold" for jobs immediately. For example, Kanner once sent photographs of a model to Defendants and they responded by asking to put him "on hold" for a Land's End campaign. (Fudali Decl., Exhs. BBB, CCC, DDD, EEE.)

37.     Models occasionally got job offers as a result of a go-see. (Todd Tr. 52:2-6, 199:16-18, Fudali Decl., Exh. C) ("Q: Have you ever seen a model to go a go-see, or test shoot and get a job out of it? A: Yes.").

For example:

- After Weber met with Bobby (*see* Pl.'s Counter Fact 22), Weber texted Todd that he thought Bobby was "very good" and "maybe [Weber] can do an editorial with him[.]" (*See* Fudali Decl., Exh. DD.)

- During a go-see at Little Bear that model Josh Ardolf ("Ardolf") attended, Weber told Ardolf that he had a job coming up for French Vogue for which Weber said he would "love to have" Ardolf. (Ardolf Tr. 36:7-22, Fudali Decl., Exh. N.) Two months later, Ardolf was booked for French Vogue. (*Id.* at 37:11-14.)

- Model Jason Van Oijen ("Van Oijen") was booked for a French Vogue shoot in 2007 "pretty soon after" his go-see with Weber. (Van Oijen 79:15-80:1, Fudali Decl., Exh. P.)

- Weber hired one of Kanner's model for an editorial two days after the model's go-see at Little Bear. (Fudali Decl., Exh. FFF, GGG, HHH, III.)

- Model Buddy Krueger ("Krueger") met with Weber for a test shoot/go-see on September 9, 2008 at Little Bear, and Defendants emailed client APC the next day recommending him for their campaign. (Krueger Tr. 162:8-11, Fudali Decl., Exh. M; Fudali Decl., Exh. X.) Krueger got the job. (Krueger Tr. 169:3-13, Fudali Decl., Exh. M; Fudali Decl., Exh. W.)

- Model Ron Kochevar ("Kochevar") was booked within forty-eight hours for a L'Uomo Vogue photoshoot after his go-see with Weber.  (Kochevar Tr. 99:13-18, Fudali Decl., Exh. Q.)

38.     One time, a model was even under consideration for a specific job at a go-see with Weber without even knowing it. (Hooper Tr. 294:11-14, Fudali Decl., Exh. R) ("Q: [D]id you

know that this was supposed to be a go-see, for the VMan shoot, where there is nudity, and that was set up by Jason Kanner and Bruce Weber? A: I did not know that.")

39.     Occasionally, Weber would ask models if he could use their photographs from a prior go-see in an editorial; for example, Little Bear emailed Kanner that Weber may want to use some go-see photographs of one of Kanner's models in a magazine. (Fudali Decl., Exh. JJJ) ("Bruce of course is over the moon about Luke… I also know he took some portraits of Luke while he was here I could see Bruce wanting to incorporate those into the V man layout[.]")  Weber reached out to Van Oijen in 2010 to ask if he could use nude photos of Van Oijen that he had taken at his house in Golden Beach, Florida in French Vogue.  (Van Oijen Tr. 353:14-354:7, Fudali Decl., Exh. P.) There is therefore an informal process to securing work as a model with Defendants, including agents' sending pictures of models to Defendants who would then occasionally respond by: inviting the model to go-see, inviting the model to a specific casting, inviting the model to a general casting, offering to find a project for the model, putting the model on hold for a job, or hiring the model for job.  (*See* Pl. Counter Facts 21-22, 30-31, 36-37.)

## C.  DEFENDANTS' CONTROL OVER PHOTOSHOOTS

40.     Defendants control the entire production of photoshoots.  (*See, e.g.,* Fudali Decl., Exh. KKK.) (contracts between Defendants and Abercrombie & Fitch stating that Defendants are responsible for production, filming, and editing for the Abercrombie & Fitch jobs).

41.     Before the photoshoots, Defendants, not the client, would tell agencies what their models should bring to the photoshoot and the how the model should appear when he arrived at the shoot.  (*See* Fudali Decl., Exh. LLL); (*see also* Fudali Decl., Exh. MMM.)

42.     At some jobs, Defendants distributed a "welcome packet" to models upon their arrival, which outlined the guidelines and expectations for the models during the photoshoots, the

schedule for the shoot days, and what type of conduct was prohibited during the photoshoots. (*See* Fudali Decl., Exh. KKK); (Fudali Decl., Exh. NNN.)

43.     Weber was in charge once the models were on location.  (Ricketson 185:17-19, Fudali Decl., Exh. I) ("Q: At the Abercrombie & Fitch photoshoots, who was in charge on set? A: Bruce."); (*see id*. at 199:20-23) (when discussing the VMan photoshoot, "Q: So who's in charge on set?  A: Bruce. Q: Was there anyone from VMan there? No.")

44.     Defendants also arranged travel for the models and provided meals on set. (*Id*. at 187:24-188:2) ("Q: Who provide the meals? A: Private chef. Q: Who hired the chef? To my knowledge, Bruce did."); (*see also* Fudali Decl., Exhs. MMM, OOO.)

45.     Weber had the authority to cut models and send them home during the client photoshoot. (Ricketson 173:2-11, Fudali Decl., Exh. I) ("Q: You testified that at your photoshoots with Abercrombie & Fitch that models could be sent home the first day.  Who would have the power to send home a model? A: Anywhere from Bruce to I believe there was – Mike Jeffries, Matthew Smith, Sam Shahid, I believe the four of them were the decision-makers.")

46.     Once the photoshoot concluded, Weber controlled which photographs were used in the campaigns. (*See* Weber Tr. 276:14-281:24, Fudali Decl., Exh. A.) ("Q: [F]or Vogue, much like the Abercrombie & Fitch, you would select the photos that you liked and those would be the ones that get sent to the art director, and then the art director would make his cuts and edits, correct? A: Yea, the same thing for Vogue in a way."); (Ricketson 188:12-16, Fudali Decl., Exh. I) ("Q: On the Abercrombie & Fitch, or other professional photoshoots, who chooses the photographs that are ultimately used in the campaign? A: To my knowledge, it's Bruce.")

47.     Agents invoiced Defendants for the services of their models, and Defendants paid the agencies directly. (Fudali Decl., Exhs. AAA, PPP, QQQ.)

## II.    WEBER'S *MODUS OPERANDI* OF FRAUDULENTLY MOLESTING MALE MODELS AT PHOTOSHOOTS

### A. WEBER'S ESTABLISHED PRACTICE OF ATTEMPTING TO SEXUALLY ASSAULT MALE MODELS DURING "BREATHING EXERCISES"

48.      Weber conducted his "breathing exercises" with at least eight witnesses in this case, not including Plaintiff Jason Boyce.  (*See* Pl.'s Counter Facts 49-55, 57.)

49.      Weber used his "breathing exercise" as a ruse to sexually assault Ardolf during a French Vogue shoot. (Ardolf Tr. 63:8-13, Fudali Decl., Exh. N.) At some point during the photoshoot, Ardolf was told that Weber wanted to take some additional photographs of him by himself. (*Id*. at 63:23-65:24.) While Weber took solo photographs of Ardolf, Weber led Ardolf through his "breathing exercises."  (*Id*. at 79:19-81:17.) Weber told Ardolf that he needed to "relax" and directed Ardolf to put Weber's hand where Ardolf "felt the energy." (*Id*. at 79:19-81:17.) Ardolf put Weber's hand on his chest, shoulder, and abdomen, then Weber forced Weber's hand onto Ardolf's genitals. (*Id*. at 81:9-82:3.)

50.      Weber used his "breathing exercise" as a ruse to sexually assault model Buddy Krueger. Weber used his "breathing exercises" with Krueger in the fall of 2008 during a Ruehl photoshoot. (Krueger 65:10-66:5, Fudali Decl., Exh. M.) Weber called Krueger into another room during the shoot by to take solo photos of Krueger. (*Id*. at 68:20-69:2.) Weber put his hand on Krueger's forehead, told him to close his eyes and relax, and said he was going to do his "breathing exercise" with Krueger. (*Id*. at 84:9-25.) During Weber's "breathing exercise," Weber put his own hand on Krueger's chest, started rubbing him, and told Krueger to "tell him when to stop." (*Id*. at 85:1-13.) Weber kept rubbing Krueger lower and lower then put his (Weber's) hand down Krueger's pants so that he was touching Krueger's genitals. (*Id*. at 85:4-86:8.)

51.     Weber used his "breathing exercise" as a ruse to sexually assault model Jacob Madden ("Madden"). During an Abercrombie & Fitch photoshoot, Weber pulled Madden away from the main photoshoot off to a structure on the side to take solo photographs of him. (Madden Tr. 88:16-89:7, 94:19-6, Fudali Decl., Exh. O.) Weber conducted his "breathing exercises" with Madden, telling Madden to channel his energy and to relax – and that then he would make it further in the industry. (*Id*. at 108:3-18.) Weber put his and Madden's hand on Madden's chest and told Madden to "feel the energy[.]" (*Id*. at 110:11-14.) During the "breathing exercise," Weber groped Madden's genitals, under the guise of tucking and untucking Madden's shirt. (*Id*. at 110:11-21.)

52.     Weber used his "breathing exercise" as a ruse to sexually assault model Jason Van Oijen. Weber conducted his "breathing exercise" with Van Oijen at a go-see in 2008. (Van Oijen Tr. 40:17-41:7, Fudali Decl., Exh. P.) Weber told Van Oijen he was too tense and instructed him to close his eyes and breathe. (*Id*. at 41:16-14.) Weber directed Van Oijen to put Weber's hand on Van Oijen's lower stomach, and Weber put his hands on Van Oijen's face and in his mouth. (*Id*. at 43:13-44:3.) Another time, Van Oijen went to Weber's home in in Golden Beach to take solo photographs with Weber. (*Id*. at 118:15-25.) Weber once again conducted his "breathing exercise" and told Van Oijen he was tense. (*Id*. at 144:4-145:10.) Weber told Van Oijen to grab Weber's hand and directed him to put Weber's hand on Van Oijen's chest and stomach. (*Id*. at 154:5-155:7.) Weber then forced his (Weber's) fingers in Van Oijen's mouth and groped and rubbed Van Oijen's genitals. (*Id*. at 154:5-155:7.)

53.     Weber used his "breathing exercise" as a ruse to sexually assault model Ron Kochevar ("Kochevar"). In approximately 1996 or 1997, Weber conducted his "breathing exercise" with Kochevar during a go-see at a hotel in Santa Monica. (Kochevar Tr. 50:10-17, 116:12-16, Fudali Decl., Exh. Q.)  While Kochevar was naked, Weber pressed Kochevar against

a wall, and moved his hand to Kochevar's chest, stomach, and upper thigh so that the back of Weber's hand was on Kochevar's genitals. (*Id*. at 78:15-82:4.) Weber did his "breathing exercise" a second time with Kochevar in 1998 at a Ralph Lauren Polo shoot in Florida. (*Id*. at 144:14-19.) There, Weber conducted the same "breathing exercise" while Kochevar was naked and touched Kochevar's leg, chest, and inner thigh. (*Id*. at 148:20-152:6.) Weber did his "breathing exercise" a third time with Kochevar at the Chateau Marmont in Los Angeles, at which point he told Kochevar to breathe. (*Id*. at 270:7-272:25.) He began touching Kochevar's body, including his genitals. (*Id*. at 270:7-272:25.)

54.    Weber used his "breathing exercise" as a ruse to attempt to sexually assault Ricketson. Ricketson described a "breathing exercise" with Weber in which Weber said he wanted to feel Ricketson's "energy" on Ricketson's body, and then Weber pressed his thumb against Ricketson's forehead. (Ricketson Tr. 26:10-28:9, Fudali Decl., Exh. I.) During the "breathing exercise," Weber grabbed Ricketson's wrist and guided Ricketson's hand to Ricketson's stomach then lower and lower on Ricketson's body until Ricketson had to stop Weber from touching Ricketson's genitals. (*Id*. at. 26:10-28:9.)  Weber attempted to touch Ricketson's genitals under the guise of conducting the breathing exercise. (*Id*. at 28:5-28:9.)

55.    During a go-see in June 2014, Weber did his "breathing exercises" with Monty Hooper. (Hooper Tr. 40:10-41:4, 61:19-62:5, Fudali Decl., Exh. R.) Weber stood very close to Hooper and put Hooper's hand on Weber's chest and asked if he felt Weber's energy. (*Id*. at 61:19-62:5.) Weber then put Weber's hand on Hooper's chest and asked if he felt Weber's energy. (*Id*. at 61:19-62:5) Weber went in to give Hooper a hug, and Weber's hands lingered on Hooper's waist. (*Id*. at 62:23-63:11.) Weber told Hooper how important it was for Hooper to be "vulnerable" and explained that if Hooper was more vulnerable, he would go a lot farther than his modeling

16

career. (*Id.* at 63:13-64:2.) Weber was very close to Hooper and Hooper was physically holding Weber back with Hooper's hands on Weber's arms to prevent Weber from getting closer to him. (*Id.* at 63:13-64:2.)

## B. WEBER'S ESTABLISHED PRACTICE OF USING PHOTOGRAPHY TO EXPLOIT MALE MODELS

56.     Weber used other fraudulent means to sexually assault male models during photoshoots.  (*See* Pl.'s Counter Fact 57-59.)

57.     During an Abercrombie & Fitch shoot in 2009, an assistant told Baldwin that Weber wanted to see Baldwin in Weber's hotel room. (Baldwin Tr. 38:24-39:1, 74:2-6, Fudali Decl., Exh. L.)  After taking some photographs of Baldwin, Weber led Baldwin through his "breathing exercises." (*Id.* at. 97:14-98:9.)  Weber told Baldwin to put Baldwin's hand on his chest, then to put his hand lower and lower until Baldwin was touching the waistband of his underwear. (Baldwin 100:8-101:8.)  Weber then said he wanted to adjust Baldwin's underwear for the photograph, but instead grabbed Baldwin's genitals. (*Id.* at 104:19-105:2.)

58.     Similarly, during Weber's solo photoshoot with Madden, Weber pretended he wanted to tuck and untuck Madden's shirt, but instead groped Madden's genitals. (Madden Tr. 110:11-21, Fudali Decl., Exh. O.)

59.     Weber sexually assaulted model Tony Barbieri ("Barbieri") during a go-see in 1992 or 1993. (Barbieri Rough Tr. 86, 94, Fudali Decl., Exh. U.) Weber was taking photos of Barbieri with Barbieri's pants and underwear down and Weber instructed Barbieri to turn his head in profile so Weber was no longer in his line of sight. (*Id.* at 124.) Weber was kneeling to take photos of Barbieri and Barbieri suddenly felt Weber touching his penis. (*Id.* at 125-126.) When he looked

down, Weber was guiding Barbieri's penis into Weber's mouth. (*Id*. at 125-126.) Barbieri immediately jumped back. (*Id*. at 125-126.)

60.     Taking nude photos with Weber was a "pay-for-play" type thing, meaning the nude photographs could lead to a lucrative job. (Janney Tr. 424:12-425:14, Fudali Decl., Exh. T.)

### C. WEBER TREATS MALE MODELS AND FEMALE MODELS DIFFERENTLY

61.     Weber states that it's "hard to do a breathing exercise with a girl" because he does not want to physically touch her. (Weber Tr. 29:20-30:13, Fudali Decl., Exh. A.) Weber did not have the same reservations with male models. (*See id*.)

62.     As part of Weber's "breathing exercise" with female models, Weber does not guide the female model's hand to her genitals. (Bernstein Tr. 93:21-25, Fudali Decl., Exh. E.) Weber does not kiss the female model on the mouth. (*Id*. at 94:1-2.) Weber does not put his fingers in the female model's mouth. (*Id*. at 94:3-5.)

63.     Weber has never touched a female model's genitals, and that fact is not in dispute (though Plaintiff contends he has touched male models' genitals). (Fudali Decl., Exh. V, Response to Plaintiffs' Interrogatory No. 1) (contending he has never touched a models' genitals in a professional setting and female models are not in dispute).

### III.     LITTLE BEAR'S COMPLICITY IN WEBER'S CONDUCT

### A. WEBER IS THE BOSS AND CENTRAL FIGURE AT LITTLE BEAR

64.     Little Bear is an S Corporation. (Bernstein Tr. 17:22-23, Fudali Decl., Exh. E.) Little Bear currently has four to five independent contractors and eight employees. (*Id*. at 33:17-34:4.)

65.     Weber is the "central talent" at Little Bear and Little Bear derives their income solely from the work of Weber. (Bush 23:10-12, 25:5-9, Fudali Decl., Exh. H.) The purpose of Little Bear is to produce and support Weber's work. (*Id*. at 17:22-18:4.)

66.     Weber is the "boss of creative decisions[.]" (*Id*. at 26:7-16.) Weber is the "top of the top" of the organization. (M. Murphy Tr. 17:13-22, 19:17-20:1, Fudali Decl., Exh. G.) Photo assistants considered Weber to be their primary boss and Nan Bush, President of Little Bear and Weber's wife, as their secondary boss. (*Id*. at 20:2-14.) Many times, while traveling with Weber, Weber was the only person to whom photo assistants would report. (*Id*. at 20:2-14.)

67.     Weber and Bush were equal partners, and there was no one above Weber at Little Bear. (*Id*. at 20:18-21.) Bush "guess[es]" that Weber would report to her, a statement she clarified was "questionable." (Bush Tr. 25:14-26:6, Fudali Decl., Exh. H.)  Bush could not think of anyone else to whom Weber would report. (*Id*. at 26:2-6.)

**B.  LITTLE BEAR'S "POLICIES" INADEQUATELY PROTECT MODELS**

68.     Little Bear has no specific sexual harassment training. (Bernstein Tr. 38:21-39:9, Fudali Decl., Exh. H.)  There is no training at Little Bear regarding sexual harassment of models. (*Id*. at 38:21-40:12.)  Little Bear agrees that it would be safer for models if Little Bear trained its staff  on how not to sexually harass them. (*Id*. at 41:1-6.)

69.     Should a model want to report inappropriate behavior at Little Bear, there is no specific procedure on how to do so; Little Bear claims that models can complain to "the person taking them down in the elevator[.]" (E. Murphy Tr. 46:25-16, Fudali Decl., Exh. F.)

70.     However, Little Bear primarily considers the protection of models to be the agent's job.  (E. Murphy Tr. 42:19-46:3, Fudali Decl., Exh. F.) ("The process, again, for me would begin with the agent in my world, it is the agent's job to be a big protector of the model.") If a model has

an issue on a go-see or test shoot, Little Bear considers it to be the agent's responsibility to inform Little Bear. (*Id*. at 46:10-24) ("It would be their agent would really be responsible for letting us know ASAP.")  This option was not provided to the models in writing. (*Id*. at 47:17-48:9.)

71.     Although Defendants delegate the safety of their models to the model's agent, Little Bear states that it has no control over how agents run their business and "what they tell kids to do, to not do." (E. Murphy Tr. 47:17-48:9, Fudali Decl., Exh. F.).  Little Bear actually *wants* to be ignorant: "I don't want to know." (*Id*. at 47:17-48:9.)

72.     Bush, Weber's only purported "supervisor," admitted she never told models or employees to come to her with complaints about Weber. (Bush Tr. 31:22-32:7, Fudali Decl., Exh. H) ("I have told employees that they should come to me if they have complaint about anybody on the shooting, not specifically Bruce.  There has never been a complaint about Bruce.").

## C. LITTLE BEAR WAS WILLFULLY IGNORANT OF WEBER'S "BREATHING EXERCISES"

73.     Weber has conducted his "common breathing exercises and professionally photographed thousands of nude models over [his] career[.]" (Weber Tr. 318:20-319:13, Fudali Decl., Exh. A).

74.     Weber only conducts his "breathing exercises" away from other people, one-on-one with the model.  (Weber Tr. 34:9-16, Fudali Decl., Exh. A.) ("Q: Is the breathing exercise best done when you are alone with a model? A: Well, it would be very, very difficult to do it, let's say, if there are a lot of people around and people were talking on their cell phones and doing all kinds of stuff.  It's best to do where it's quiet, yes.")

75.     Little Bear knew that Weber regularly met with models alone, however no one at Little Bear asked what Mr. Weber did with models when he was alone with them. (Weber 37:2-

11, Fudali Decl., Exh. A) ("Q: Is it common in your practice as a photographer to be alone with a model during a photo shoot?  When I say alone, I mean just you and the model, no assistants, no one else? A: Oh, yes."); (Bernstein Tr. 94:16-18, Fudali Decl., Exh. E.) ("Q: Did Little Bear know that Mr. Weber would meet with models alone? A: Yes."); (*Id*. at 94:19-95:5) ("Q: Did anyone from Little Bear ever ask him what he did with the models when he was alone? A: No[.]")

76.     Weber's predatory behavior was so widespread that models would warn each other about Weber. (Ricketson 178:22-179:4, Fudali Decl., Exh. I) ("Q: Did you ever try to warn another model about Bruce Weber? A: Yes. . . If I came in contact with another model that was going to see Bruce for the first time, I would tell him to look out for the breathing exercises…") In fact, models used the term getting "Brucified" as a shorthand for Weber's inappropriate behavior on set. (Van Oijen Tr. 265:17-267:22, Fudali Decl., Exh. P) ("Q: And, again, you did not witness anything inappropriate either? A: I did witness Bruce take one of the younger models away from the scene into a private shooting, private setting. . . Q: What did somebody say to you? A: I don't remember who it was, but somebody turned around and quoted to me oh, he's going to get Brucified. . . I witnessed him take a model away.  And I with my own ears saw another person turn to me and say he's going to get 'Brucified.'")

77.     Agents knew about Weber's problematic breathing exercises. (*See* Todd Tr. 30:12-21, Fudali Decl., Exh. C.; *See also* Fudali Decl., Exh. AA.)  Kanner heard model complain about Weber's breathing exercises.  In response to an Interrogatory asking about any complaints Kanner received about Weber, Kanner responded "[o]ver the course of many years, [Kanner] has had various models comment on Mr. Weber's breathing exercises, which are well-known in the industry." (*See* Fudali Decl., Exh. AA.)

78.     Yet, Weber and Little Bear claimed they had never received a complaint about Weber's "breathing exercises" or models being "Brucified," showing that Little Bear's system of relying on agents to report misconduct utterly failed.  (Weber Tr. 35:9-36:17, Fudali Decl., Exh. A; Bernstein Tr. 94:12-15, Fudali Decl., Exh. E.)

79.     Despite Weber's widespread use of his breathing exercises and their notoriety, not one Little Bear employee claims to have ever heard about Weber's conducting breathing exercises before the instant lawsuit. (*See* Tomassone Tr. 10:7-9, 13:2-4, 36:23-37:15, Fudali Decl., Exh. S.) (former casting director who worked for Defendants for twenty years had not heard of Weber's "breathing exercises" prior to the lawsuit being filed); (Tautrim Tr. 9:16-18, 78:9-80:21, Fudali Decl., Exh. K.) (former photo assistant who had worked for Defendants for fifteen years never saw Weber conduct a "breathing exercise" with a model and had not heard the term "breathing exercise" until after the lawsuit); (Morick Tr. 9:9-15, 31:25-3, Fudali Decl., Exh. J.) (current operations manager who has worked for Defendants for thirty-six years never saw Weber do breathing exercises); (M. Murphy Tr. 17:13-22, 46:15-17, Fudali Decl., Exh. G.) (former photo assistant who worked for Defendants for eleven years had never seen Weber do a "breathing exercise" with a model).

80.     Little Bear concedes that any level of unwanted touching is inappropriate but does not find Weber touching models during his "breathing exercises" to be inappropriate, even after hearing the allegations in the current lawsuit. (Bernstein Tr. 86:12-17, 96:8-11, Fudali Decl., Exh. E.)  Of course, should a model find Weber's touching unwanted, there is no one else present in the room to speak up for him and Little Bear has no avenues available for him to report Weber.  (*See* Pl.'s Counter Fact 69, 74.)

## IV.     PLAINTIFF JASON BOYCE'S ORDEAL WITH BRUCE WEBER

## A. BOYCE AND HIS AGENTS CONTACT WEBER FOR AN EMPLOYMENT OPPORTUNITY

81.     Boyce wanted to meet with Weber because Boyce believed it would help his modeling career.  (Boyce Tr. 100:6-9, Fudali Decl., Exh. D) ("Q: What do you remember about Bruce Weber, why you wanted to get in front of him? A: I knew that he made the careers of a lot of successful male models.")

82.     Boyce enjoyed some success in the modeling industry; he "shot with some really good photographers that believed in him and really wanted to work with him" and "booked some cool jobs" like American Crew and MAC Cosmetics. (Todd Tr. 200:1-10, Fudali Decl., Exh. C.) Boyce testified he was able to make some money modeling and work on projects that he loved. (Boyce Tr. 31:9-13, 55:18-23, Fudali Decl., Exh. D.)

83.     Todd was Boyce's "mother" agent in California. (Todd Tr. 197:24-198:21; 206:25-207:13, Fudali Decl., Exh. C.)

84.     Todd has been in the business of model management for twenty-five years. (Todd Tr. 15:22-24, Fudali Decl., Exh. C.) Todd met Weber when Todd was nineteen and developed a friendship with him throughout the years. (*Id*. at 84:9-85:4.) Weber supported Todd's career throughout his moves between three different agencies. (*Id*. at 84:9-85:4.) Todd credits one of the reasons for his success as an agent to his continued professional and personal relationship with Weber. (*Id*. at 84:9-85:4.)

85.     Todd believed that Weber would be interested in working with Boyce, based on Weber's taste and the type of models Weber liked. (*Id*. at 111:15-112:12.)

86.     Boyce was constantly told that his look would be great for Weber. (*Id*. at 131:14-23) (Todd: "Everyone would always say, oh, you would be great for Bruce Weber, to [Boyce]. And I think he really was hoping that Bruce would hire him.")

## B. WEBER RESPONDS POSITIVELY TO BOYCE'S PHOTOS AND AGREES TO MEET WITH HIM

87.     Both Todd and Jason Kanner sent photographs of Boyce to Weber in order to seek employment for Boyce from Weber. (*See* Boyce Tr. 130:8-13, Fudali Decl., Exh. D) ("Q: It was your words that it was – an opportunity that you had been trying to get year after year after year. This is what you wanted. A: I mean, yes, it's what I wanted, but it's also what my agent wants, as well.  It's advantageous for both of us.")

88.     Weber positively responded to the photographs of Boyce. In March 2013, Todd texted a photo of Boyce to Weber. (Brown Decl., Ex. M.) Weber responded to Todd three minutes after receiving Boyce's photo, "Where is he from and when can I see him?" (*Id.*) Weber asked Todd again that evening, "When can I see him? What is the personality[?]" (*Id.*) The next day, on March 2, 2013, Weber texted Todd, "Is Jason in town and how long[?]"  (*Id.*) When Todd failed to respond, less than ten minutes later, Weber texted Todd again, "??????0" (*Id.*)

89.     Todd called Boyce and told him that Weber wanted to meet Boyce at Weber's hotel. (Boyce Tr. 116:18-117:17, Fudali Decl., Exh. D.) Boyce was shooting a Lexus commercial and could not leave the set, so he did not meet with Weber at that time. (*Id*. at 116:18-117:17.)  Todd said he would try to work out another date with Weber. (*Id*. at 116:18-117:17.)

90.     In February 2014, Todd texted Weber another photo of Boyce. (Brown Decl., Ex. N.) After Todd sent Weber the photo, Weber once again showed interested in Boyce. (*Id.*) Weber

responded that evening, "Very handsome!" "What's the personality like?" "Where is he from" "Where does he live now?"  (*Id.*)

91.     Todd believed that Boyce was not able to shoot with Weber during the first few years of contacting Weber solely because of Weber and Boyce's timing. (Todd Tr. 111:15-112:12, Fudali Decl., Exh. C.)

92.     On November 19, 2014, Kanner emailed photos of Boyce to Weber. (Brown Decl., Ex. Q.) Weber responded to Kanner's email, "Hey Jason he [Boyce] is really handsome in an old school way- maybe I can meet him in NYC when I come back to the city in December- or if he is in Miami- where is he from[?]" (*Id.*)

93.     On November 24, 2014, Kanner told Boyce that Weber had agreed to a go-see with him. (Boyce Tr. 129:21-23, Fudali Decl., Exh. D.) Kanner told Boyce that the go-see with Weber was a "big opportunity" for Boyce. (*Id.* at 129:24-130:7.)

## C. WEBER INVITES BOYCE TO A PHOTOSHOOT AFTER THEY MEET AT A JEWELRY STORE

94.     On December 12, 2014, Boyce met Weber at a small jewelry shop ("Jewelry Store Meeting"). (Boyce Tr. 131:18-132:21, Fudali Decl., Exh. D.)

95.     At the time of the Jewelry Store Meeting, Weber did not remember any of the previous photographs of Boyce that had been sent to him. (Weber Tr. 88:15-21, Fudali Decl., Exh. A.)

96.     The Jewelry Store Meeting was a go-see. (Boyce Tr. 137:6-11, Fudali Decl., Exh. D) ("Q: Now, the purpose of meeting Bruce Weber at Tiffany's was to figure out what he wanted to do at the go-see; right?  It was to meet you and talk to you for a few minutes? A: So that meeting was the go-see.  That meeting at the jewelry store was the go-see.")

97.     During the Jewelry Store Meeting, Weber told Boyce that he wanted to photograph him, establishing his interest in Boyce as a model. (Boyce Tr. 139:7-140:14, Fudali Decl., Exh. D.) Weber told Boyce he had a great look, and told Boyce what to wear and not to shave before his photoshoot. (Boyce Tr. 144:8-145:1, Fudali Decl., Exh. D) (Weber Tr. 92:16-93:6, Fudali Decl., Exh. A.)

98.     Boyce testified that Weber told him at the Jewelry Store Meeting that he would set up a photoshoot with Boyce through his agent, Kanner. (*See* Boyce Tr. 361:18-21, Fudali Decl., Exh. D.) ("Q: When you met with Bruce Weber at the jewelry story, did he pass on you? A: No. Q: What did he do? A: He set up a photo shoot with me."); (*see id.* 139:70-140:14) (when questioned about what Weber said at the jewelry store, Boyce responded, "Bruce Weber said that he would set it up [the photoshoot] with Jason [Kanner], and he told me not to shave.") Weber testified that the photoshoot was set up with Kanner *prior* to the Jewelry Store Meeting. (Weber Tr. 92:16-95:12, Fudali Decl., Exh. A.)  Kanner cannot recall how the photoshoot was arranged, or even if Kanner was the one who arranged the photoshoot. (*See* Fudali Decl., Exh. AA) ("[Kanner] cannot recall with specificity and in detail how the photoshoot between Mr. Weber and Plaintiff was arranged, or even if it was [Kanner] who arranged the photoshoot").

99.     Weber had the authority to cancel a one-on-one photoshoot with a model if he wanted.  (Bush Tr. 46:7-12, Fudali Decl., Exh. H.) Had Weber decided he did not like Boyce's look at the jewelry store meeting, Weber could have cancelled the "go-see" that Weber alleges was set up in advance of their meeting.

### D.  BOYCE GOES TO LITTLE BEAR FOR A GO-SEE PHOTOSHOOT WITH WEBER

100.     Weber scheduled the go-see for December 15, 2014 at Little Bear. (*See* Boyce Tr. 144:18-21, Fudali Decl., Exh. D.)  Kanner told Boyce that the photoshoot was a test shoot. (*Id.* at

137:14-20.)  Boyce characterized the photoshoot as either a test shoot or job interview with Weber. (*Id*. at 147:5-16.)

101.    The purpose of the go-see was to see if Weber liked Boyce and would hire or refer him for future jobs, as Boyce wanted to work with Weber. (*See* Boyce Tr. 147:5-148:5, Fudali Decl., Exh. D); (Fudali Decl., Exh. AA) ("Plaintiff had repeatedly expressed his interest in working with Mr. Weber[.]") Defendants admit that the photoshoot was a go-see (not a "portrait session") in their Amended Responses to Plaintiff's First Set of Interrogatories. (*See* Fudali Decl., Exh. Y) (listing Jeanine Morick, Jeffrey Tautrim, Natalia Ortega, and Nathaniel Kilcer as witnesses with relevant information all being "present at the location of the go-see."); (*see* Fudali Decl., Exh. Z; Bernstein Tr. 16:14-23, Fudali Decl., Exh. E) (confirming that original verification applies to Amended Interrogatory Responses). Throughout Todd's and Boyce's depositions about the December 2014 go-see, defense counsel referred to the photoshoot as a "go-see" and asked questions about the "go-see," not a "portrait session." (Boyce Tr. 119:18-20, Fudali Decl., Exh. D) ("Q: At the go-see for Bruce Weber in December, didn't you expect to take nude shots with Bruce Weber at the go-see just like you did with Darren Tieste?"); (*Id*. at 137:6-14.) ("Q: Now, the purpose of the meeting with Bruce Weber at Tiffany's was to figure out what he wanted to do at the go-see; right… Didn't he tell you what to wear at the go-see?"); (*Id*. at 116:18-21) ("Q: Now it wasn't until Jason Kanner later reached out with a non nude, as we talked about already in December 2014, that a go-see was actually set up with Bruce Weber; correct?"); (Todd Tr. 60:11-14, Fudali Decl., Exh. C) ("Q: [W]ould you agree with me, that Jason – the thing of value that Jason got from Bruce Weber was at that go-see in December of 2014, he got pictures from Bruce Weber?"); (*Id*. at 111:15-18) ("Q: But when he finally gets the go-see, in December 2014, do you

agree that every time that Bruce has been approached about looking at Jason, he was either not interested, didn't bother, and showed no interested?")

102.    The only reason a model would go to the Little Bear studios is for a go-see, casting, or campaign photoshoot. (E. Murphy Tr. 34:7-35:11, Fudali Decl., Exh. F.) There has been no evidence in this case of Weber conducting portrait sessions at Little Bear. (*See* E. Murphy Tr. 34:24-7, Fudali Decl., Exh. F.) Weber would rent out a space for a "portrait session" rather than have it at the Little Bear studios.  (Bush Tr. 22:7-25, Fudali Decl., Exh. H.).

103.    A "go-see" is synonymous with a casting. (E. Murphy Tr. 30:21-32:20, Fudali Decl., Exh. F) ("A go-see generally means a casting").

104.    The go-see could not have been a "portrait session" because "portrait sessions are where clients commission and pay Weber to take their portrait." (E. Murphy Tr. 34:24-7, Fudali Decl., Exh. F.) Boyce did not commission or pay for the photographs Weber took of him. (Bernstein Tr. 73:19-74:3, Fudali Decl., Exh. E) ("Q: And who paid for the prints [referring to the prints of Boyce]? A: Little Bear paid for the prints.  Q: And who paid for the messengering of the contact sheet and the prints? A: Little Bear. Q: Did anyone pay Mr. Weber for his time? A: No.") In fact, Weber never sent the photographs to Boyce, and did not bother to send the photographs to Kanner until April 24, 2015.  (Fudali Decl., Exh. YYY.)

**E. WEBER SEXUALLY ASSAULTS BOYCE DURING THE LITTLE BEAR "GO-SEE"**

105.    Boyce arrived at Little Bear on December 15, 2014 for the photoshoot. (*See* Boyce Tr. at 214:2-215:16, Fudali Decl., Exh. D.)

106.    Boyce arrived at Little Bear at 205 Hudson Street, (Bernstein Tr. 52:11-14, Fudali Decl., Exh. E), and after about ten minutes, Weber led Boyce to a room in the back corner of Little

Bear. (Boyce Tr. 153:24-155:10, Fudali Decl., Exh. D). After Weber finished a conversation with one of his assistants, the assistant left the room, leaving Weber and Boyce alone. Someone closed the sliding doors to the room.  (*Id*. at 155:11-156:25.) Boyce and Weber sat down and talked for about five minutes. (*Id*. at 163:8-164:5.)

107.    Weber took a few photographs of Boyce and then told Boyce he looked tense. (Boyce Tr. 164:24-165:6, Fudali Decl., Exh. D) Weber dipped his thumb in a container of oil he was carrying and rubbed it in circles on Boyce's forehead. (*Id*. at 165:1-166:2.) Weber rubbed oil on Boyce's forehead for several minutes and then stood back and proceeded to take more photographs of Boyce. (*Id*. at 166:18-21.)

108.    Weber said that Boyce would be more relaxed if Boyce allowed Weber to conduct his "breathing exercises." (*See* Boyce Tr. 364:12-24, Fudali Decl., Exh. D.) While Weber took more photographs of Boyce, he continued to tell Boyce to relax, while rubbing his forehead.  (*Id*. at 172:17-19.)

109.    Weber requested that Boyce remove his shirt, which Boyce did.  (*Id.* at 173:20-174:4.)

110.    Weber asked Boyce to take off his pants and shoes, which Boyce did.  (*Id*. at 175:9-18.) Weber took more photos of Boyce in his underwear.  (*Id*. at 176:16-21.)  Weber directed Boyce how to pose, said Boyce looked beautiful, and told Boyce he looked like "a Norwegian fisherman." (Boyce Tr. 180:18-23, Fudali Decl., Exh. D; Weber Tr. 120:25-121:16, Fudali Decl., Exh. A.)  Weber told Boyce again that he looked tense, that he was trying to be too masculine, and that the photographs in Boyce's book were "too scowly" and "too tough[.]" (Boyce Tr. 182:7-14, Fudali Decl., Exh. D.)

111.    Weber started rubbing Boyce's forehead again and asked Boyce to pull his underwear up or down. (*Id.* at 182:20-183:17.)  Boyce kept pulling his underwear up as high as he could, and then would pull it down, but avoided pulling his underwear all the way down and exposing himself. (*Id.* at 183:12-183:17.)

112.    After several rounds of Boyce pulling his underwear up and down on his body, Boyce felt Weber grab his hands. (*Id.* at 188:4-9.)  Boyce's hands were still on his underwear and Weber began to push Boyce's hands down until Boyce's underwear fell to his ankles. (*Id.* at 187:24-189:20.)  Weber then took more photographs of Boyce. (*Id.* at 189:21-25.)

113.    After a few more photographs, Weber came up close to Boyce and told him to put Boyce's hand on Weber where Boyce felt the "energy."  (*Id.* at 193:7-23.) Weber then told Boyce to put Boyce's hand where Boyce felt the energy on himself. (*Id.* at 193:18-23.)  Weber had Boyce go back and forth between Weber's body and Boyce's body.  (*Id.* at 193:24-194:4.) Boyce put his hand on Weber's chest, shoulder, or stomach and on his own chest, shoulder, stomach, or face. (*Id.* at 194:7-13.)

114.    Weber then grabbed Boyce's wrist and told Boyce to put his hand where he felt the energy on himself. (*Id.* at 194:7-21.) Weber then pushed Boyce's hand down his body until Boyce was touching his own genitals. (*Id.* at 194:7-21.)

115.    Weber told Boyce that if he "could just have confidence that [he] would really go far," and asked Boyce how ambitious he was. (*Id.* at 194:24-195:3.) Although Boyce initially tried to resist, he then acquiesced. (*Id.* at 203:10-204:1.) Boyce gave into Weber's molestations as he believed it was the only way to ever get work from Weber in the future. (*Id.* at 363:3-18) ("I didn't know – you know, on one hand, I'm thinking, you know, I can't physically assault this guy.  You

know, on the other hand, if I – if I reject him or don't let him do what he wants to do, then, you know, he's not going to work with me, you know, again.")

116.    With Weber's hand still on Boyce's arm and wrist, Weber began moving Boyce's hand back and forth over Boyce's genitals. (*Id*. at 195:12-19.)

117.    Weber then asked Boyce to put Boyce's hand on Weber again. (*Id*. at 195:20-25.) This time, Weber was more forceful and directed Boyce's hand to Weber's genitals. (Id. at 195:20-25.)

118.    Weber stepped back and took a few more photographs of Boyce, then repeated the same exercise, asking Boyce where he felt the "energy" with Weber's hand on Boyce's wrist. (*Id*. at 196:9-17.)

119.    After that "breathing exercise," Weber told Boyce they were done and to put his clothes back on.  (*Id*. at 196:9-17.)  When Boyce had his pants on, Weber called Boyce over to him.  (*Id*. at 197:9-13.) Weber got very close to Boyce, stared at him, and told him he was beautiful. (*Id*. at. 197:9-19.)

120.    Weber told Boyce to close his eyes and then put his fingers in Boyce's mouth.  (*Id*. at. 197:20-198:6.)  While Boyce's eyes were still closed, Weber kissed Boyce on the mouth. (*Id*. at 197:20-198:6. 200:5-19.) Boyce pulled back, Weber told Boyce they were done, and Boyce left. (*Id*. at 197:20-198:8.)

**F.   DEFENDANTS INVITE BOYCE TO A CASTING IN APRIL OF 2015**

121.    On April 13, 2015, Kanner emailed some photographs of Boyce to Weber, and wrote: "HI BW//JASON BOYCE ( I LOVE LOVE LOVE) IS BACK FROM L.A.. YOU MET HIM AND LOVED..DO YOU REMEMBER…DO YOU HAVE TIME [sic] TLO MEET HIM THIS WEEK? XXX" (Fudali Decl., Exh. RRR.)

122.     Weber did not correct Kanner's statement that he "LOVED" Boyce. (*Id.*) Instead, Weber forwarded Kanner's email to Dawn Tomassone. (*See id.*) Tomassone replied to Weber that she would "add Jason" to the casting she had just sent out. (*Id.*)

123.     Tomassone then emailed Kanner later in the evening on April 13, 2015 telling Kanner she would add Boyce to the casting on for that Friday. (Fudali Decl., Exh. SSS.)

124.     Boyce attended the casting on April 17, 2015. (Fudali Decl., Exhs. TTT, UUU.) Boyce went to the casting because wanted to get modeling work. (Boyce Tr. 246:8-11, Fudali Decl., Exh. D.)

125.     On April 17, 2015, Weber emailed Kanner that all of the models Kanner sent to him for the casting were great. (Fudali Decl., Exh. VVV) ("Thank you Jason for sending us such great guys- they were all like you said.")

126.     On April 24, 2015, Little Bear emailed Kanner a list of Kanner's models from the April casting that Weber wanted to send to "Maia at Ralph Lauren[.]" (Fudali Decl., Exh WWW.) Weber is closely connected to Ralph Lauren. (Fudali Decl., Exh. XXX.)  Boyce was not on the list.


Dated: New York, New York
March 12, 2020                                    **THE BLOOM FIRM**


                                                 By:      /s/ Arick Fudali
                                                       Arick Fudali
                                                       Anna Levine-Gronningsater
                                                       Sarah Bloom
                                                       85 Delancey St. #29
                                                       New York, NY 10002
                                                       E-mail: arick@thebloomfirm.com
                                                       Telephone: (954) 661-6734
                                                       Facsimile: (866) 852-5666
                                                       *Attorneys for Plaintiff Jason Boyce*